(No. 46102.—

THE PEOPLE *ex rel.* HENRY C. PONDER, Petitioner, v. PETER B. BENSINGER *et al.,* Respondents.

*Opinion filed March 29, 1974.*

John J. Connors, of Wm. Marshall Lee, of Chicago, for petitioner.

William J. Scott, Attorney General, of Springfield (James B. Zagel and John Patrick Healy, Assistant Attorneys General, of counsel), for respondents.

Joseph J. Putnick and Robert Greenwalt, of Chicago, for *amicus curiae* Prison Legal Services Project.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

Leave to file this original petition for *habeas corpus* was granted on September 20, 1973, and the matter is now before us on the petition, the respondents' motion to dismiss, and facts stipulated by the petitioner, Henry C.

Ponder, and the respondents, who are officials of the Department of Corrections.

In June of 1962, a jury in the circuit court of Cook County found Ponder guilty of assault with intent to commit murder, and he was sentenced to imprisonment for not less than 1 nor more than 14 years. In July of 1962, Ponder pleaded guilty to two indictments charging him with voluntary manslaughter and to one indictment charging him with armed robbery. On his pleas of guilty he was sentenced to three concurrent terms of imprisonment for not less than 2 nor more than 20 years. These sentences were to be served concurrently with the sentence for assault with attempt to commit murder. His post-conviction petition, which alleged that his pleas of guilty were coerced, was denied after a hearing, and the appellate court affirmed. *People v. Ponder* (1973), 10 Ill. App. 3d 613.

The petition alleges that Ponder is due to be released from the Illinois State Penitentiary at Joliet on May 29, 1975, that 27 months of his "good time" credits were revoked without due process of law by the Department of Corrections in prison disciplinary proceedings conducted in 1966, 1967, and 1971, and that if those credits were restored, he would be eligible for immediate and unconditional release.

Summarized, in 1966 Ponder was charged with having refused to obey an order, having threatened a prison officer, and having called an officer obscene names; in 1967 he was charged with having created a disturbance in the isolation office by refusing to go to his isolation cell when ordered to do so, cursing prison officers and resisting and fighting officers as they placed him in an isolation cell.

Both in 1966 and in 1967, the Disciplinary Captain of the Illinois State Penitentiary at Joliet conducted a fact-finding hearing to determine the truth of the charges. Ponder was notified orally of the accusations against him either at the time he appeared before the Disciplinary Captain or immediately prior thereto. Written statements

of the accusing guards were read at the hearing, and Ponder was given an opportunity to respond. In each instance the Disciplinary Captain adopted the written statements of the guards as his findings of fact and referred the findings to the Merit Staff of the prison for review and disciplinary action. One of the five members of the Merit Staff was the Disciplinary Captain who had conducted the fact-finding hearing. Ponder did not appear before the Merit Staff. As a result of the proceedings in 1966 and 1967, the Merit Staff recommended that a total of 15 months of Ponder's "good time" be revoked. Both the warden of the prison and the Director of the Department of Corrections approved those recommendations.

In 1971, Ponder was charged with striking and fighting with prison guards. A three-member disciplinary committee, one of whom was a noncustodial employee of the prison, conducted another fact-finding hearing. Ponder was given written notice of the accusations against him either at the time of the hearing or immediately prior to his appearance. Written statements of the accusing guards were read at the hearing, and Ponder responded by admitting the truth of the charges. The disciplinary committee adopted the written statements of the guards as its findings of fact, gave Ponder a written statement of their decision, and recommended that he forfeit one year of good time. The findings and recommendation were referred to the Merit Staff.

In 1971, the administrative regulations required that the Merit Staff have five members

"*** composed of persons in the following classifications, as designated by the Chief Administrative Officer:

a. An Assistant Chief Administrative Officer —Merit Staff Chairman,

b. Two members of the program staff,

c. Two senior custodial staff members of lieutenant rank or above."

Ponder appeared before the Merit Staff and again admitted

the truth of the charges. After considering Ponder's prison record and the number and character of his rule infractions, the Merit Staff recommended that one year of good time be revoked. Both the warden of the prison and the Director of the Department of Corrections approved the Merit Staff's recommendation.

The requirements of due process as they apply to internal prison disciplinary proceedings have been the subject of increasing judicial, administrative and legislative attention in recent years, and the procedures that were followed in 1966, in 1967, and in 1971 have been superseded by comprehensive legislation and new regulations that afford additional safeguards for prison disciplinary hearings. Section 3—8—7(e) of the Unified Code of Corrections, which became effective January 1, 1973, provides:

> "In disciplinary cases which may involve the imposition of disciplinary isolation, the loss of good time credit or eligibility to earn good time credit, or a change in work, education, or other program assignment of more than 7 days duration, the Director shall establish disciplinary procedures consistent with the following principles:
>
> (1) Any person or persons who initiate a disciplinary charge against a person shall not determine the disposition of the charge. The Director may establish one or more disciplinary boards to hear and determine charges. To the extent possible, a person representing the counseling staff of the institution or facility shall participate in determining the disposition of the disciplinary case.
>
> (2) Any committed person charged with a violation of Department rules of behavior shall be given notice of the charge including a statement of the misconduct alleged and of the rules this conduct is alleged to violate.
>
> (3) Any person charged with a violation of rules is entitled to a hearing on that charge at which time he shall have an opportunity to appear before and address the person or persons deciding the charge.
>
> (4) The person or persons determining the disposition of the charge may also summon to testify any witnesses or other persons with relevant knowledge of the incident. The person charged may be permitted to question any person so summoned.

(5) If the charge is sustained, the person charged is entitled to a written statement of the decision by the persons determining the disposition of the charge which shall include the basis for the decision and the disciplinary action, if any, to be imposed.

(6) A change in work, education, or other program assignment shall not be used for disciplinary purposes without prior review and approval under Section 3—8—3." Ill. Rev. Stat. 1973, ch. 38, par. 1003—8—7(e).

These governing principles go far to insure that the requirements of the due process clause of the Fourteenth Amendment will be met. We have examined most, if not all, of the decisions of the Federal and State courts bearing upon this problem, and we regard the scholarly opinion of Judge Stevens, writing for the United States Court of Appeals for the Seventh Circuit in *United States ex rel. Miller v. Twomey* (1973), 479 F.2d 701, as the leading authority. In the *Miller* case, the Court of Appeals held that an in-prison disciplinary hearing that results in the revocation of good-time credits must provide the following procedural safeguards (479 F.2d at 716, 718):

(1) adequate and timely written notice to the prisoner of the charges against him,

(2) a fair opportunity to explain his version of the incident,

(3) an opportunity to request that other witnesses be called or interviewed, and

(4) an impartial decision-maker.

The Unified Code of Corrections explicitly requires notice, and section 804(7) of the present administrative regulations require that "[t]he inmate must receive written notice of the charge or charges against him at least 24 hours prior to the hearing before the Disciplinary Committee ***." Similarly, section 804(10) of the administrative regulations provides: "The inmate may request the Board to interview witnesses with relevant knowledge, and such request shall ordinarily be granted by the Board, unless it is found to be excessive or unreasonable. Such witnesses found to have relevant information shall be called to

testify before the Committee and may be questioned by the inmate." In all other respects the statutory principles meet the due process standards stated in the *Miller* case. Principle (3) provides that the prisoner is entitled to a hearing and the opportunity to address the fact-finder, and principle (1) provides for an impartial decision maker. These statutory principles are supplemented by the present regulations. See, *e.g.*, Administrative Regulations of the Department of Corrections, secs. 804, 812, 813.

The petitioner contends that *Adams v. Carlson* (7th Cir. 1973), 488 F.2d 619, requires us to hold that the administrative forfeitures of good time resulting from the 1966, 1967, and 1971 charges must be set aside because the procedures were constitutionally inadequate. In *Adams*, in an opinion by Chief Judge Swygert, the Court of Appeals held that *Miller* is "entirely retroactive." (488 F.2d at 627.) The *Adams* case involved the procedures followed in 1972 disciplinary hearings that had resulted in the segregated confinement of prisoners at the Federal penitentiary at Marion, Illinois. After reviewing *Linkletter v. Walker* (1965), 381 U.S. 618, 14 L. Ed. 2d 601, 85 S. Ct. 1731, and other cases involving the prospective or retroactive application of newly announced constitutional doctrines, the Court of Appeals appraised the following three factors (488 F.2d at 627-28): (1) "the interest of '[b]oth the state and the inmate *** in the accuracy of the factual determination that the prisoner is in fact guilty of a serious rule infraction' "; (2) the reliance by prison officials on previous procedural standards; and (3) the impact on the administration of justice of applying the new procedural standards retroactively.

The court considered that "the 'very integrity of the fact-finding process' was vitally at stake," and that providing "a new hearing to segregated inmates is far less likely to disrupt the administration of justice than were the retrials which would have resulted had *Linkletter* come out the other way ***." (488 F.2d at 627, 628.) And the

court supported its position by asserting that "a *Miller* rehearing raises a relatively minor problem of lost or forgetful witnesses since it is fair to say that segregation is typically a shorter affair by far than the term of a criminal sentence." 488 F.2d at 628.

We have carefully considered the necessity of a retroactive application of the standards announced in *Miller* with respect to disciplinary proceedings that resulted in the loss of good time. Those standards were of course not available to the prison authorities when the disciplinary hearings involved in this case were conducted in 1966, 1967 and 1971. As late as 1971, the leading authorities were apparently *Sostre v. McGinnis* (2d Cir. 1971), 442 F.2d 178, and *Adams v. Pate* (7th Cir. 1971), 445 F.2d 105, cases which could hardly be regarded as indicating the future course of decision. The procedures followed in the Illinois penal system prior to 1971 seem to have conformed generally to the provisions of the Model Penal Code. (American Law Institute, Model Penal Code, sec. 304 (Proposed Official Draft 1962).) But the fact that the reliance of the State upon the then-existing standards was justified, while entitled to considerable weight, is not of itself determinative, and so we turn to a consideration of other factors.

Both the State and the prisoner are interested in the accurate determination of any factual issues that may exist with respect to alleged violations of prison discipline. The interest of the prisoner in attaining his liberty as promptly as possible is obvious. So, too, is the interest of the State in maintaining custody of the prisoners, protecting prison guards, and protecting prisoners one from another.

The significance of these latter considerations is shown in *Gutierrez v. Department of Public Safety,* one of the cases reported with the *Miller* case. (479 F.2d 701.) Gutierrez had been severely injured by a fellow inmate, and what was before the Court of Appeals was his action for damages against the prison officials because they did

not prevent the assault from taking place. The argument was that the aggressor, a prisoner named Bright, should have been segregated from the general prison population and that because he had not been so segregated, the Department and its officers were liable to the defendant. Judge Aldisert of the Court of Appeals for the Third Circuit recently quoted the comment of a conscientious Federal district judge which illustrates the same point:

> "The judge commented that he was afraid he had been playing warden, but was not sure that he had succeeded well. He remarked that while he thought he had given the prisoners their constitutional rights, he had also crippled prison discipline. The guards were now scared; what is more, they were demoralized. He observed that guards are now taunted, abused and spat upon, that competent personnel are leaving. As a consequence, many of the prisoners are at the complete mercy of other prisoners—toughs and bullies who are having a field day." Aldisert, Judicial Expansion of Federal Jurisdiction, 1973 Law and the Social Order 557, 566.

The difficulties of proof that are involved in a retroactive application of the *Miller* standards to good-time forfeitures differ sharply from those involved in the *Adams* case, where, as Judge Swygert emphasized, the problem of lost or forgetful witnesses raised only "a relatively minor problem." As the present case demonstrates, disciplinary proceedings involving good-time forfeitures will not involve current or recent occurrences, and the problem is a major one. The accuracy of factual determinations as to occurrences that took place many years ago is not, in our opinion, likely to be enhanced by new hearings conducted in accordance with newly developed standards of due process. The inmate population of a prison is constantly shifting, and even in those cases in which guards who were present when disciplinary breaches took place in years

prior to 1973 are still available, the accuracy of their memories is not assured. The burden upon the administrative staff that would be inflicted by the conduct of further hearings with respect to revocations of good time for occurrences which took place many years ago is a heavy one.

The important goal of rehabilitation can be set back by a sense of injustice on the part of prisoners. On the other hand, the number of appeals from pleas of guilty and the volume of unfounded post-conviction petitions and other forms of collateral attack upon convictions strongly suggest that the desire for repeated hearings is not related to the factual accuracy of the prior determination, but stems from some source other than past unjust treatment. In the present case, for example, rehabilitation of the petitioner would hardly be advanced by a new hearing with respect to the 1971 charge of striking prison officers—a charge which the prisoner admitted at the time. Breaches of prison discipline, including violent conduct of the kind involved in this case, can fairly be regarded as an indication that the prisoner is not yet ready to be released into society.

For these reasons we have concluded that the standards announced in the *Miller* case are not to be applied retroactively in cases of prison discipline.

The motion to dismiss the petition is allowed, and the writ of *habeas corpus* is quashed.

*Writ quashed.*