Eddie **ADAMS** et al., Plaintiffs-
Appellants,

v.

Norman **CARLSON**, Director of the Federal Bureau of Prisons, et al.,
Defendants-Appellees.

No. 73–1268.

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1973.

Decided Aug. 23, 1973.

As Amended Oct. 4, 1973.

Rehearing Denied Oct. 31, 1973.

Michael E. Deutsch, G. Flint Taylor, Jr., Chicago, Ill., for plaintiffs-appellants.

Henry A. Schwarz, U. S. Atty., Frederick J. Hess, Asst. U. S. Atty., E. St. Louis, Ill., for defendants-appellees.

* Chief District Judge John W. Reynolds of the Eastern District of Wisconsin is sitting by designation.

** Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

1. The complaint cites 28 U.S.C. §§ 1331(a), 1361 as basis for federal jurisdiction.

Before SWYGERT, Chief Judge, REYNOLDS,* District Judge, and GRANT,** Senior District Judge.

SWYGERT, Chief Judge.

■ Appellants are inmates of the federal penitentiary at Marion, Illinois. Approximately ten months ago they instituted a class action[1] against Norman Carlson, Director of the Federal Bureau of Prisons, and various officers of the Marion penitentiary. Their complaint alleged that each member of the class was in segregated confinement at Marion,[2] that placement in that status by prison authorities was not attended by procedural safeguards guaranteed by the due process clause of the Fifth Amendment, and that the segregated confinement at issue was in violation of the prohibition by the Eighth Amendment of cruel and unusual punishment. Also claimed was the imposition by Marion officials of undue restrictions on the prisoners' rights of access to courts and counsel. With these allegations before him, and after a hearing on the matter, the district judge denied plaintiffs' motion for a preliminary injunction. Adams v. Carlson, 352 F.Supp. 882 (E.D. Ill.1973). This appeal followed.

I

Appellants were segregated after a general work stoppage on July 17, 1972. The disruption was in violation of prison rules requiring labor of all able-bodied inmates. To thwart the stoppage, Marion officials first confined the entire prison population to their cells. Most inmates were released six days later, on July 24, after seven inmates suspected to be prominent instigators of the mutiny

2. The class has dwindled since the suit was filed. By the time appellants filed their brief in this court, their class had been reduced by twenty percent. At the time of oral argument, only fifty percent remained. The Government concedes, however, that this residue is sufficient to leave the lawsuit intact.

were relegated to segregation, along with ten supporters insistent upon accompanying them. Work apparently resumed as normal for only a short time thereafter. On the afternoon of July 25, a disturbance again put a halt to regular prison activity. Taking no chances with simply isolating the ringleaders, the Marion administration undertook widespread segregation of inmates suspected of insubordination; approximately eighty-six more prisoners were removed from the general population.

Marion authorities then convened an Adjustment Committee for the purpose of finalizing placements in segregation,[3] Assistant Warden Fenton being designated chairman. Each suspect appeared before the Committee in person and was orally confronted with the charges against him. He was allowed to comment on these accusations and was informed of the identity of the officer who had gathered the information upon which Committee suspicion was based.[4] The source of the information was not revealed, nor was the inmate allowed to peruse the report of the investigating officer. The Adjustment Committee then rendered its judgment on evidence comprised solely of the officer's report and the inmate's justifications. Where guilt was found, the Committee imposed punishment by indefinite placement in segregation.

It is less clear whether appellants received notice of the charges against them in advance of their respective appearances before the Adjustment Committee.[5] On the whole, the evidence strongly supports a finding that many of them did not. The administrative guidelines in force at Marion during the period in question did not mandate advance notice,[6] and several inmates testified to a dearth of prior notice.[7] Assistant Warden Fenton himself admitted that no advance written notice was given the inmates.[8] Also manifest on the

---

3. See Marion Penitentiary, Policy Statement MI–7400.5B (Oct. 19, 1970) :

 ADJUSTMENT COMMITTEE. Adjustment Committee membership includes the Chief Correctional Supervisor, Chairman, Correctional Supervisor of the Unit, and Caseworker from the Classification and Parole section and the Associate Warden serving in Advisory Capacity. It is their responsibility to receive and investigate misconduct reports, conduct hearings, make findings and impose effective goal-oriented disciplinary action.

 \* \* \* \* \*

 All major misconduct reports will be referred to the Adjustment Committee. Following action by the Adjustment Committee, the Associate Warden and Warden will review the disposition.

4. Marion Penitentiary, Policy Statement MI–7400.5B (Oct. 19, 1970) states:

 The reporting personnel will immediately notify the area or shift Correctional Supervisor that a misconduct has occurred and will furnish the Correctional Supervisor a written report.

5. The trial judge found :

 A special adjustment committee was designated to consider their [appellants'] cases and because of the large number involved in the work stoppage, in excess of 100 inmates, some inmates apparently did not appear before the committee or receive notification of the charges against them for several days. 352 F.Supp. at 891.

Appellants attack the finding that a mere "several days" elapsed between initial segregation and hearing, citing the fact that a hearing report on inmate Mares is of record dated August 30, 1972. The record, however, also contains this testimony :

 Q. [Y]ou [Mares] say you live in the I segregation unit, is that correct?

 A. Yes, sir.

 Q. And when were you taken to that segregation unit?

 A. July 25th, 1972.

 Q. And were you ever brought into a— before an adjustment committee for a hearing?

 A. Yes, sir.

 Q. And what date was that?

 A. On or about July 28th, Friday, 1972. (Tr. 261.)

6. Marion Penitentiary, Policy Statement MI–7400.5B (Oct. 19, 1970) required only that "personnel [reporting a misconduct] will, *when possible*, notify the inmate that he is being reported for misconduct and the nature of the misconduct." (emphasis supplied).

7. Throgmartin (Tr. 14) ; Adams (Tr. 152).

8. Fenton testified :

 Q. And under the old procedures [in force at hearing time], is it correct to

record is the fact that Marion inmates had no written book of rules or regulations prior to the July work stoppage.

■ Trouble at Marion was not abated by the segregation of rebellious inmates. Sometime in the early hours of August 18, 1972, inmates in one of the two Marion segregation units ignited their mattresses and threw them into the range hallway. They also succeeded in flooding cells and hallways by blocking sinks and toilets while running the water. After or during the time that order was restored, guards stripped the cells of each inmate in segregation of whatever property was thought to constitute a combustible fire hazard. This included, of course, books and papers without limitation, as well as clothes and mattresses. Some of the clothing was returned to the inmates immediately after its thorough search for contraband. Mattresses or their replacements were back in the possession of inmates no later than August 26 or 27. Yet many of the inmates had not been able, upon request, to secure the return of their legal materials by the time evidence was taken on their motion for preliminary relief; [9] the trial judge found that "[s]ome of the material apparently has been returned, and some has not." [10] 352 F.Supp. at 890. The same description pertained at the time we heard the argument of this case.[11]

Segregation cells were again searched on October 16, 1972, after inmates had refused to return their plastic food trays and utensils to attending guards. In one cell guards discovered a loaded gun. There was nothing particularly unusual about the weapon itself; being crudely

---

say that written notice ·was not given to the inmates?

A. Yes.

\* \* \* \* \*

Q. Is it correct, sir, that there was no formal written notice given to—to these men who were put in the segregation unit via the work stoppage before they came before your committee?

A. Yes. (Tr. 522–23).

9. Appellants argue that prison authorities erred not only in their retention of confiscated legal materials but in their failure to allow appellants reasonable access to the prison law library and to jailhouse lawyers, and that the trial judge wrongly refused to order this access. We cannot agree that the judge erred. In their original motion for a preliminary injunction, appellants alleged this alone:

That legal papers, books, briefs, and correspondence have been confiscated . . . [and that] they have been denied reasonable access to their attorneys.

An addendum to their motion filed thereafter does not appreciably amplify these allegations other than to supply a factual background. The same may be said of appellants' supplemental motion for a preliminary injunction, as well as of appellants' motion for a temporary restraining order and related corrrespondence. The only hint in the record of appellants' present complaints is found in their brief in support of preliminary relief:

Plaintiffs have alleged that their legal materials, briefs, letters and other similar possessions have been confiscated by the defendants. They further allege that some of these legal materials have been destroyed. In addition many Plaintiffs have [sic] pending legal actions, including parole hearings, are being denied reasonable access to their own legal materials and are being denied access to the prison law library.

This was not enough, we think, to fairly apprise the trial judge of a claim of restricted access to the prison library, to say nothing of its failure even to suggest a deprivation of access to jailhouse lawyers. The judge did not err in failing to make factual findings on those complaints or issue a related mandate, and we will not entertain these tardy contentions on appeal. United States v. Lewis, 484 F.2d 734 (7th Cir. 1973).

10. Appellants also argue that legal materials were seized prior to the events of August 19. Inmates Throgmartin and Mares, they say, lost their materials when moved to segregation, while Adams lost his on July 17, 1972. The trial judge made no findings on these claims. He evidently felt that these inmates would rightfully have lost their materials after the August disturbance, and that prior seizures were irrelevant for the purposes of injunctive relief.

11. Counsel for the Government admitted at oral argument that the prison is currently holding a number of carefully bagged and labelled collections of legal materials belonging to various of the appellants.

made of household items, authorities concluded that the inmate in possession had assembled it in his cell. The explosive powder which charged the apparatus caused more consternation, however. Assistant Warden Fenton testified to his belief that this material was of a commercial variety and that it had been brought in from beyond the prison walls. On this basis, substantial modification was made to the attorney visiting room at Marion.

The room originally had been fitted with a table and chairs. Prior to a meeting with his attorney, an inmate had been thoroughly strip-searched. The meeting occurred under close visual surveillance by a prison guard, and the prisoner was again searched upon leaving the room. In fear after the gunpowder incident that the post-meeting search of an inmate was inadequate to reveal his possession of small and durable objects or contraband surreptitiously passed to the inmate by his attorney during a moment of inattention by the guard, prison authorities divided the room with a soundproof glass barrier. Phones were provided for communication between inmate and lawyer. In order to pass written information, an attorney must now present the material to a guard, who takes it out of the room and around through the entry door on the prisoner's side of the room.

Suit was brought by inmates in segregation on September 11, 1972, some time before the revamped attorney visitation system was put into operation. Alleging irreparable injury, the inmates sought, by motion for a preliminary injunction, immediate relief from their indefinite segregation without due process, their restricted access to attorneys, and the retention of their legal materials earlier confiscated by prison authorities. The district judge denied their motion in its entirety. With respect to the due process claim, the judge found that appellants had not "made a strong showing of complete lack of due process in the past, of probability of success on the merits, or of irreparable harm," 352 F.Supp.

at 893, since Marion officials had instituted hearing procedures in full accord with our decision in Adams v. Pate, 445 F.2d 105 (7th Cir. 1971), only a few days prior to the hearing on appellants' motion for a preliminary injunction. Nor did the judge agree that cruel and unusual punishment had been shown. He likewise denied the request of appellants for a mandatory return of their legal materials, finding that the implementation of a newly adopted prison directive requiring inmate access to legal materials disposed of the claim. Lastly, he refused to order the slightest modification to the bisected attorney visiting room. The new system, he felt, was "not ideal, but . . . [did] permit minimal access of inmates to their attorneys." 352 F.Supp. at 890.

This appeal was subsequently taken pursuant to 28 U.S.C. § 1292(a)(1).

## II

When the trial judge issued his memorandum opinion denying appellants a preliminary injunction, his sole guide to the stance of this Circuit on due process in the prison disciplinary context was Adams v. Pate, 445 F.2d 105, 108 (7th Cir. 1971). Were he to redecide the issue today, he would have available our recent and directly relevant decision in United States ex rel. Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973), where we spoke to the requirements of the due process clause when prisoners are placed in punitive segregation. Our ultimate holding was that candidates for segregation sufficiently severe to impose a "grievous loss" of liberty were entitled to "an adequate and timely written notice of the charges, a fair opportunity to explain and to request that witnesses be called or interviewed, and an impartial decision maker." *Miller*, at 718. These were the bare minima. Each case in *Miller* involving segregation was remanded to its respective district court for an additional finding, namely, the extent to which other of the due process maxima embodied in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.

2d 484 (1972), were essential to the discipline of prisoners in conformity with the due process clause.

■ Whether *Miller* would have made a difference to the district judge in this case is open to question, since he did not conclude that the hearings held at Marion in July and August of 1972 were in compliance with *Pate*. He found, instead, that procedures which satisfied *Pate* had been instituted *after* those hearings. Unless, however, the newly instituted procedures provide some means for correcting what were arguably old errors, we fail to perceive how the new methods moot a claim based on the old. The Government has produced not a whit of evidence to prove its provision of an effective rehearing to prisoners segregated after the July chaos,[12] and the question before us must be whether the original hearings passed the test of due process.

We return, then, to *Miller*. The Government asserts that the disciplinary hearings at issue were held in full compliance with the minimal standards set out by our decision in *Pate* and by other cases of the time. *See, e.g.,* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971). To apply *Miller* now, they argue, would violate an established and venerable proscription of retroactive decisionmaking. It is also argued that the original hearings fully complied with *Miller*. We reject both propositions.

■ In another era, the common law was adamant in its insistence that judges were without authority to limit a decision to prospective effect: The duty of the court, Blackstone wrote, was not to "pronounce a new law, but to maintain and expound the old one." 1 Blackstone, Commentaries 69 (15th ed. 1809).

Decisions of recent vintage have made significant inroads on this view, as is amply apparent from the doctrinal revolution which began with Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). There the United States Supreme Court advanced the proposition—then novel—that "the Constitution neither prohibits nor requires retrospective effect" for decisions expounding new constitutional rules affecting criminal trials. 381 U.S. at 629, 85 S.Ct. at 1737. No longer presumed, retroactivity was found to be a matter determined by a balance of exigencies against the extent to which a new rule went to the fairness of trial. The more marked was the focus of a new decision on the "very integrity of the fact-finding process," 381 U.S. at 639, 85 S.Ct. at 1743, the greater was the burden on the Government to display its reliance upon old rules and to make a case that retroactive application of the new decision would result in a probable and extensive disruption of the administration of criminal justice.

Weighing these criteria to fix the temporal expanse of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the Court struck the balance in favor of prospectivity. Local law enforcement officials were found justifiably to have relied on Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), which *Mapp* overturned. The Court took cognizance, too, of numerous practical difficulties which would likely have attended an extension of *Mapp* to times past, including the requirement of hearings on the admissibility of evidence long since destroyed or misplaced, and, where error was found, the provision of a retrial complicated by the absence of original witnesses or the dimming of

---

12. The new regulations, Marion Penitentiary, Policy Statement MI–7400.5C (July 17, 1972), require the following:

Every inmate who spends over ten continuous days in segregation status will have his case formally reviewed by the Committee a second time and this review will be repeated at least every 30 days thereafter that the inmate remains in segregation. This means that the Committee will have the inmate appear before them or if the circumstances so dictate, the Committee will visit the inmate where he is being confined.

We cannot conclude from this that the review contemplated by the regulation would suffice to correct procedural flaws in the original commitment hearings of appellants.

their memories. The Court found no counterbalance to these problems, *Mapp*, it held, was aimed in large part at deterring lawless police conduct; whether lawless or not, evidence obtained by that conduct was of indubitable reliability and relevance.

*Linkletter* was the first in a long line of cases giving prospective effect to rules newly propounded in the field of constitutional criminal procedure. It was direct authority for cases like Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), and Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), where the Court limited to prospective effect the Fourth Amendment interpretations of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1968). *See also* Fuller v. Alaska, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968). New decisions relating to criminal procedure grounded in the Fifth and Sixth Amendments were limited in retroaction by an analysis akin to that made in *Linkletter*. Adams v. Illinois, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972); Mackey v. United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971); DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Tehan v. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966).[13] *Johnson,* which denied retroactive effect to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), is noteworthy for a variation it took on the *Linkletter* analysis. To counter the unavoidable fact that *Miranda* and *Escobedo* provided "important new safeguards against the use of unreliable statements at trial," the Court placed emphasis on the fact that prisoners without the benefit of those decisions had available the protection of a substantive test of voluntariness founded on the due process clause, a test which took "specific account of the failure to advise the accused of his privilege against self-in-

13. By and large, these cases are the doctrinal progeny of *Linkletter* insofar as they adhere to its threefold test for retroactivity. They diverge considerably, however, on the date which they set for a retroactive limit. *Tehan* followed *Linkletter* in requiring that the rule with which it dealt applied to all cases on direct review at the time the rule came down. *Johnson* went on to hold that *Miranda* and *Escobedo* were effective in all cases which went to trial after their respective dates of decision. *Stovall* then moved the date forward farther still, holding *Wade* and *Gilbert* applicable to cases which involved confrontations occurring after their date of decision, a result followed in *Desist, Williams, Adams* and, in part, *DeStefano*. Two aberrations occurred in the interim separating *Stovall* from *Adams*; *Fuller* held that the exclusionary rule of Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968)—based on deterring violations of section 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605, rather than the Fourth Amendment—was to apply only to trials in which tainted evidence was sought to be introduced after *Lee*, while *DeStefano* appeared to apply the cutoff date of *Johnson* in holding that Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), which arguably required unanimous verdicts in criminal cases, applied only to trials which began after its date of decision, rather than to cases where a jury was charged thereafter. The reasons for these aberrations are not at all clear, nor is the reasoning which supports the date approved in *Johnson*. *See* Schwartz, Retroactivity, Reliability, and Due Process, 33 U.Chi.L.Rev. 719, 763 (1966); Mishkin, Foreword: The High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56 (1965); The Supreme Court 1965 Term, 80 Harv.L.Rev. 91, 140–41 (1966). In any event, it is clear that appellees carry a two-fold burden on their contention that *Miller* should be prospectively applied. They must show that *Miller* is like *Mapp* and that the advanced date approved in *Stovall*, not *Johnson*, is the one from which prospectivity should be measured, since the trial in this case has not yet taken place. We need not reach the second of these questions if appellees cannot prevail on the first.

crimination or to allow him access to outside assistance," failures which formed the respective foci of *Miranda* and *Escobedo*, 384 U.S. at 730, 86 S.Ct. at 1779. The same technique was employed in *Stovall*, where the Court made reference to due process restrictions on pretrial confrontation in refusing to give retroactive effect to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), cases which fashioned exclusionary rules to deter police from pretrial exhibition of a suspect to witnesses for identification purposes without notice to or the presence of counsel.

Few, we think, would doubt the proposition that *Miller* is a case which "readily lends itself to the analysis established in *Linkletter*." Robinson v. Neil, 409 U.S. 505, 507, 93 S.Ct. 876, 877, 35 L. Ed.2d 29 (1973). *Robinson* found fully retroactive a rule propounded under the double jeopardy clause in Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L. Ed.2d 435 (1970). The Court distinguished *Linkletter* and its progeny, noting that the practical result of the double jeopardy clause "is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial." 409 U.S. at 509, 93 S.Ct. at 878. To the extent that a prison disciplinary hearing may be analogized to a criminal trial, *Linkletter* must be our analytical touchstone, for *Miller* was concerned almost exclusively with the procedural integrity of prison hearings.

Drawing the necessary analogy is an easy task. *Miller* involved disciplinary hearings aimed at imposing a grievous loss of liberty on an inmate, a deprivation which we viewed as equivalent to that suffered by a parolee upon his return to prison. In dealing with the topic of parole and its revocation in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court—conceding that "the full panoply of rights due a defendant in

. . . a [criminal] proceeding does not apply to parole revocations," 408 U.S. at 480, 92 S.Ct. at 2600—held that the liberty of parole was nonetheless valuable and under the aegis of the Fourteenth Amendment. What a prisoner suffers upon segregation, then, differs from what he suffered upon conviction by shades of degree, not of kind. That the prisoner is convicted by an administrative prison board instead of a court makes no significant difference. Nor does it matter that *Miller* and this case arise in a civil rather than a criminal context. See *Linkletter*, 381 U.S. at 627, 85 S.Ct. 1731.

Of the three factors determinative of prospectivity in *Linkletter*, the one which weighs in favor of retroactivity is most strongly represented here; our holding in *Miller* was founded on the interest of "[b]oth the state and the inmate . . . in the accuracy of the factual determination that the prisoner is in fact guilty of a serious rule infraction." *Miller*, 479 F.2d at 715. The "very integrity of the fact-finding process" was vitally at stake. And there exist no other constitutional protections of the process with which *Miller* dealt; *Miller*, in essence, is like Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), or Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L. Ed.2d 1265 (1959), the due process cases which the *Johnson* Court cited to soften the nonretroactivity of *Escobedo* and *Miranda*. We need go no farther to hold *Miller* entirely retroactive:

Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circum-

stances. Williams v. United States, 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971).

We will, nevertheless, continue on to examine the factors of reliance by and impact upon agencies of law enforcement. On the whole, they bolster, not weaken, our conclusion.

The reliance which prison officials may have placed on *Pate* and its predecessors cannot be gainsaid, but neither can the fact that their provision of a new hearing to segregated inmates is far less likely to disrupt the administration of justice than were the retrials which would have resulted had *Linkletter* come out the other way or had *Adams*, where not only a new trial but a new indictment and preliminary hearing would have been required. A rehearing under *Miller* is a much less complex and time-consuming matter than a criminal retrial. Moreover, a *Miller* rehearing raises a relatively minor problem of lost or forgetful witnesses since it is fair to say that segregation is typically a shorter affair by far than the term of a criminal sentence.[14] If a man commits a crime against state or federal law while in prison, he is tried in a court of law and sentenced to additional time in prison. Segregation is not usually imposed for criminal misconduct; it is reserved, instead, to correct serious infractions of prison rules. For a single such event, segregation does not and should not exceed a few months, if that long.[15]

14. Several states place a statutory maximum on the time for which a prisoner may be segregated, including Missouri, Ann.Mo. Stats. § 216.455(1) (1962) (ten days), New Hampshire, N.H.Rev.Stats.Ann. § 622:14 (1955) (thirty days), and Tennessee, Tenn. Code Ann. § 41–707 (1955) (thirty days). Note, in addition, the regulations of the Texas Department of Corrections referred to in Novak v. Beto, 453 F.2d 661, 667 (5th Cir. 1971) (fifteen days maximum), and those of the Department of Corrections, District of Columbia, cited in Fulwood v. Clemmer, 206 F.Supp. 370, 378 n. 29 (1962) (fifteen days maximum). See also note 15, *infra*.

15. See American Correctional Association, Manual of Correctional Standards, 246, 253 (1959):

Punitive segregation is ordinarily used as punishment when reprimand, loss of privileges, suspended sentence, and similar measures have been tried without satisfactory results and when the infractions are not serious enough to warrant bringing the inmate to trial in a criminal court. In some cases it accompanies one or more of these other forms of punishment. It is a major disciplinary measure, which can have damaging effect upon some inmates, and should be used judiciously when other forms of action prove inadequate or where the safety of others or the serious nature of the offense makes it necessary.

 \* \* \* \* \*

When an inmate is punished by trial in an outside court and the imposition of an additional sentence, it is not considered double punishment to segregate him on normal diet while awaiting action or after conviction, as a precautionary safeguard. There is a distinction between administrative segregation and punitive segregation. Confusion arises from the fact that an inmate is frequently segregated for a comparatively short period as punishment (for an assault with a knife on another inmate, for example) and is then placed in administrative segregation for an indefinite period for the general good of the institution. It may be said the latter type protection of the inmate and the institution is for mutual convenience rather than punishment of the individual.

 \* \* \* \* \*

*Time Limits*: Segregation for punishment should be for the shortest period that will accomplish the desired result of making the inmate amenable to discipline, and in any event not over thirty days. With most inmates and for most infractions a period of a few days proves sufficient. In other cases, a few days in punitive segregation followed by thirty to ninety days in administrative segregation, or in some other status that involves continued control or loss of privileges is sufficient. Excessively long periods for punishment defeat their own purpose by embittering and demoralizing the inmate. If he needs to be segregated for a long period, it should be in administrative segregation rather than punitive segregation.

See also Center for Criminal Justice, Boston University School of Law, Summary Report, Model Rules and Regulations on Prisoners' Rights and Responsibilities 15, 16 (prepared for the Massachusetts Department of Cor-

■■ We conclude that *Miller* sets the standard which governs this appeal [16] and reverse the district court, there being little doubt that the safeguards of *Miller* were not provided appellants.[17] There can be equally little doubt that appellants have shown, in addition, that the absence of preliminary relief will cause them irreparable harm. Imprisonment in segregation is the condition perhaps most paradigmatic of that term.

As in *Miller*, we remand this case to the district court to determine the extent to which the standards therein enunciated require enlargement or clarification. This need not be done, of course, where the penitentiary regulations now in force obviate the need for enlargement or clarification on constitutional grounds. Following this determination, the district court shall order new hearings by Marion authorities to be attended, at the very least, by the minimum safeguards of *Miller* and the protections afforded by current regulations. Since the appellants have already suffered a lengthy stay in segregation, the district judge shall proceed forthwith and require the same of Marion officials. In no event shall his mandate issue later than fifteen days after the release of this opinion, and appellees shall have, at the most, thirty days to rehear appellants' cases.

### III

■ We turn now to the problem created by alterations to the attorney visitation room at the penitentiary. The Government would have us uphold the remodeling on the rationale advanced by the district judge, who found that the measure, albeit "stringent," was a need-

---

rection; typewritten and dated September, 1972):

[A] section [of the Model Rules] strongly discourages use of transfer to a Departmental Segregation Unit, the maximum security status which currently exists. Under the proposed rules, inmates can be transferred to D.S.U., if at all, only upon conviction of two major rule violations within a 6-month period. Current regulations do not limit the amount of time which can be served in a D.S.U. Under these rules, a limit of thirty days is set for transfers to D.S.U.

The only exceptions to the thirty day requirement are upon inmate request for protective custody. An inmate requesting transfer to a D.S.U. may remain as long as he chooses, but he will be encouraged to return to the general population or accept transfer to another institution.

\* \* \* \* \*

For isolation and separate confinement, increased security arrangements imposed at the institutional level, these rules provide some discretion. Isolation is to be used only for major violations of disciplinary rules (or a persistent pattern of minor violations) and is limited to ten days rather than the current fifteen. The change follows trends in several states.

Separate confinement may be imposed for disciplinary violations for periods of up to thirty days. It may also be used for protective custody.

16. In its present posture, this case is unlike a suit for damages under a Civil Rights statute, where the constitutionality of official conduct is measured by the state of promulgated decisional law at the time of the acts in question. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Gaito v. Strauss, 249 F.Supp. 923 (W.D.Pa.), aff'd on other grounds, 368 F.2d 787 (3d Cir. 1966); Bowens v. Knazze, 237 F.Supp. 826 (N.D.Ill.1965). We are presently concerned with injunctive relief aimed at vacating the prior decision of an administrative tribunal. *See generally* United States ex rel. Jones v. Rundle, 358 F.Supp. 939 (E.D.Pa.1973).

17. The Government refused to concede this point, but it is clear beyond cavil. Appellants were sentenced to indefinite segregation without adequate advance written notice of the charges against them. It also may be that Assistant Warden Fenton, having personally participated in quelling the work stoppage and related events, was not, as Chairman of the Adjustment Committee, the "impartial decision maker" required by *Miller*. Lastly, we wonder whether appellants were given "a fair opportunity . . . to request that witnesses be called or interviewed." A "fair opportunity" can scarcely be said to exist if prison authorities were predisposed to deny a request for witnesses. That state of affairs is suggested by the record; not one of the 103 inmates placed in segregation was allowed to call witnesses on his behalf.

ed security precaution adequate to provide inmates with "minimal access" to their attorneys. 352 F.Supp. at 890. The appellants take direct issue with the standard of "minimal access" and call to our attention numerous restrictive aspects of the bisected room. Documents and written communications cannot be passed directly from lawyer to inmate; a guard, materials in hand, must circumvent the outer perimeter of the room, often taking as long as five minutes.[18] If the attorney chooses not to take this option, but nevertheless desires to discuss with his client the contents of one or more documents not then in the possession of the inmate, he must hold the document to the glass partition and refer to it from memory or from an extra copy as he speaks to his client over the phone.[19] Contemporaneous discussion of two or more documents, or of a ponderous transcript, thus becomes a formidable undertaking. Equally formidable, it is argued, is an attempt by two or more attorneys to speak to one or more inmates, a particular problem in class action litigation of the sort now on appeal. Lastly, attorneys for appellants note the difficulty of establishing from behind glass a satisfactory working relationship with inmates who survive daily in an atmosphere charged with distrust. According to appellants, the Constitution requires a reinstitution of the original arrangement. Given the paucity of evidence in the record to support the Government's view that Marion officials reasonably feared importation of contraband by appellants' attorneys, we reverse the ruling of the district judge.

 Citation of authority is hardly needed for the proposition that an inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold. Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed.2d 1034 (1941); Coleman v. Peyton, 362 F.2d 905 (4th Cir. 1966); Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965); Spires v. Bottorff, 317 F.2d 273 (7th Cir. 1963). All other rights of an inmate are illusory without it, being entirely dependent for their existence on the whim or caprice of the prison warden. Stiltner v. Rhay, 322 F.2d 314 (9th Cir. 1963). The judiciary, moreover, has not been content merely to keep free the lines of communication between the inmate, the courts, and agencies of correction. Whether as a vital concomitant of the prisoner's right to petition the bench or as a distinct requirement of his right to effective counsel guaranteed by the Sixth Amendment, a right of access by an inmate to counsel has been perceived by a number of courts. *Compare* Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970), *with* Moore v. Ciccone, 459 F.2d 574, 577 (8th Cir. 1972). Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), for example, required that pris-

18. A related complaint is that a "document could be read or even reproduced in the period in which the guard passing the document disappears out of view." App. Br. at 13. We cannot address this contention. Were counsel for appellants to place confidential material in a sealed envelope, prison authorities would violate the Constitution by breaking the seal before the envelope reached the prisoner. Smith v. Robbins, 454 F.2d 696 (1st Cir. 1972). If the presence of contraband is reasonably suspected, penitentiary officials may open the envelope only in the presence of the addressee-inmate. Appellants have alleged neither their use nor the unauthorized opening of sealed envelopes, and their contention of invaded privacy is unsupported and untimely.

19. Appellants also make much of the potentiality of the phone system for monitoring by Marion officials, and argue that an inmate's fear of a phone tap inhibits his free discourse with counsel. Yet modern technology has taught that a room may be planted with electronic ears as easily as a phone may be tapped. Absent some evidence of record that the phone tap is a markedly superior form of surveillance—or, to put it another way, that everyday bugging is so inferior a form of eavesdropping as to lessen the "chilling effect" reasonably brought about by an inmate's fear of being overhead—we will not consider this claim. There is little evidence to support a conclusion that the phones are actually tapped, and the trial judge rejected the charge as a matter of fact.

on authorities allow inmates ready access to jailhouse lawyers. In the same vein, prison officials have been prohibited from interfering with postal communications between an inmate and his counsel which relate to the legality of either his criminal conviction or the conditions of his incarceration. Goodwin v. Oswald, 462 F.2d 1237 (2d Cir. 1972); Moore v. Ciccone, 459 F.2d 574 (8th Cir. 1972); Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); McDonough v. Director of Patuxent, 429 F.2d 1189 (4th Cir. 1970); Carothers v. Follette, 314 F. Supp. 1014, 1023 (S.D.N.Y.1970); Fulwood v. Clemmer, 206 F.Supp. 370, 376 (D.D.C.1962), even where the lawyer is not the inmate's counsel of record. Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970); Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Coleman v. Peyton, 340 F.2d 603 (4th Cir. 1968); *compare* McCloskey v. State of Maryland, 337 F. 2d 72 (4th Cir. 1964). The final phase of this development has been a recognition that the effective protection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context. Thus there has been widespread agreement that communications by post between an inmate and his attorney are sacrosanct, subject only to tests on incoming mail for the presence of contraband which fall short of opening it when the inmate is not present. Smith v. Robbins, 454 F.2d 696 (1st Cir. 1972); Merritt v. Johnson, No. 38401 (E.D.Mich., Nov. 30, 1972); Marsh v. Moore, 325 F.Supp. 392 (D. Mass.1971) (outgoing mail also held subject to inspection); Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970); *see* Goodwin v. Oswald, 462 F.2d 1237, 1245 (2d Cir. 1972) (Oakes, J., concurring); Moore v. Ciccone, 459 F.2d 574, 578 (8th Cir. 1972) (Lay, Heaney, Bright and Ross, JJ., concurring); Mor-

ales v. Turman, 326 F.Supp. 677 (E.D. Texas, 1971); *contra,* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971). Oral intercourse has been hedged with similar protection. Rhem v. McGrath, 326 F.Supp. 681, 691 (S.D.N.Y.1971);[20] *see* Morales v. Turman, 326 F.Supp. 677 (E.D.Texas 1971).

This case presents a somewhat different aspect of the overall problem. We have no censor editing the factual or conceptual content of what passes between an inmate and his counsel over the phones and through the glass of the barrier in the visiting room. The privacy of each encounter is scrupulously maintained. What is involved, instead, is a restriction on the ease with which attorney-client meetings *could* be carried on, and a lessening of personal interplay between inmates and counsel. By so phrasing the issue, we do not intend to denigrate its importance; nevertheless, we do not view the partition to create an impediment to communication of the magnitude seen where direct censorship is undertaken by prison officials.

■■■■■■ Given this view, we decline appellants' invitation to find that a "fundamental" interest is threatened by the partition arrangement, the infringement of which the Government must justify by showing some compelling need.[21] We need not do so to invalidate the separation. However lightly one may view the complaints of appellants about the isolation and inconvenience of the existing facility, the justifications offered by the Government in its support weigh lighter still and fall markedly short of stating a rational basis for its erection. To justify his impairment of communication between attorneys and inmates in the name of security, a prison warden must come forward with facts which tend to support a reasonable suspicion not only that contraband is being smuggled to inmates in the face of

---

20. It is significant that this development first took place within the Second Circuit, where prison authorities are free to read all prison mail under Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971).

21. *See* Morales v. Schmidt, 489 F.2d 1335 at n. 6 (7th Cir. 1973), reheard en banc, May 29, 1973.

established preventive measures, but that their attorneys are engaged in the smuggling. We ground the last requirement on our unwillingness to assume that attorneys—admittedly the partisan advocates in court of their clients' cause—are more willing or more inclined to smuggle contraband past prison officials than are other outsiders who deal directly with inmates, as well as on our recognition of the constitutional importance of the business which an attorney typically conducts with an inmate, a status not attending the affairs which prison personnel carry on with an inmate nor usually shared in equal measure by the business transacted between an inmate and a reporter or clergyman. The former requirement rests on the obvious proposition that prison authorities may not restrict the exercise of constitutional rights by those in their charge without showing a threat to the order or security of their institution. The only testimony taken below related to that point; Warden Fenton offered his belief that gunpowder found in an inmate's cell could not have come from inside penitentiary walls. Absent Fenton's qualification as an expert, or at least as a witness knowledgeable in the art of explosives, this statement will not support a conclusion of smuggling, particularly in light of the fact that Fenton was directly contradicted by the possessor of the powder as to its origin. And this flaw comprises only a part of the error committed below, for the record is barren of evidence to support a finding that appellants' attorneys were responsible for misconduct.

■ We might add that the advancement by the Government of a suitable justification for its alterations would nevertheless leave officials of Marion subject to censure for their treatment of counsel. A means of regulating intercourse between inmate and attorney less restrictive than the bisect-

ed room but equally secure was made available to them, for the lawyers of appellants evidenced a willingness to submit to a search before meeting with their clients.[22] It is true, no doubt, that a warden places the safety of his institution at stake whenever he chooses to allow tactile intercourse between inmates and outsiders. But a careful search of an outsider prior to his contact with inmates reduces the warden's risk to the vanishing point. Where an attorney visiting an incarcerated client offers to waive his right to resist a search by prison guards, a penal institution errs at the expense of the inmate's right of full access to the courts when it declines the offer of his counsel and requires a conference by phone across glass.

In accord with the request of appellants, the district court shall enjoin Marion officials from requiring attorneys for appellants to confer with their clients in the partitioned visiting room. The phones and partition must be removed or a new and undivided room provided.

## IV

■ Along with the recognition of a prisoner's right of access to the courts has come the realization that a prisoner must have access to legal materials, particularly where he is unable to retain counsel and must petition the courts *pro se*.

> "Access to the courts," . . . is a larger concept than that put forward by the State. It encompasses all the means a defendant or petitioner might require to get a fair hearing from the judiciary on all charges brought against him or grievances alleged by him. . . . Johnson v. Avery, . . . . makes it clear that some provision must be made to ensure that prisoners have the assistance necessary to file petitions and

---

22. Counsel for appellants expressed at oral argument their willingness to undergo search by prison authorities prior to meeting inmates. This sentiment was apparently expressed to Marion authorities after the visiting room was bisected; needless to say, the offer was declined.

complaints which will in fact be fully considered by the courts. Gilmore v. Lynch, 319 F.Supp. 105, 110 (N.D. Cal.1970), *aff'd sub nom.* Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971).

True to this philosophy, the Supreme Court, reciting Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), affirmed in *Gilmore* the disapproval by a three-judge district court of a state penitentiary regulation which severely limited the breadth of legal data available to state prisoners. *Accord* Hooks v. Wainwright, 352 F.Supp. 163 (M.D.Fla.1972) (*de facto* restriction). The question presented by appellants with respect to the confiscation of their legal materials [23] is not strictly analogous to that presented by the California inmates in *Gilmore*.[24] More relevant to the present issue is a decision of this circuit, Sigafus v. Brown, 416 F.2d 105 (7th Cir. 1969), where we held that a complaint alleging the destruction by prison guards of an inmate's legal papers essential to his ongoing appeal stated a good cause of action for damages under the Civil Rights Act. "[T]he

deprivation of materials necessary to afford reasonable access to the courts" was, we ruled, a violation of due process. 416 F.2d at 107. *Accord,* DeWitt v. Pail, 366 F.2d 682 (9th Cir. 1966).

Though the trial judge attempted to distinguish *Sigafus*, we are at a loss to discern his rationale. The same may be said of the Government's position on this appeal. If a prisoner may sue for damages when his legal materials are irrevocably confiscated, then surely he may seek an injunction mandating the return of materials held intact by prison officials after confiscation. The judge, moreover, did not find that undestroyed materials were irrelevant to the prosecution of appellants' existing or potential legal actions.[25] The gravamen of his decision appears to be that officials of Marion were justified in removing legal materials from the cells of appellants, who might well have been expected to employ them as fuel for a range fire closely arising out of the one set in the segregation unit during the "riotous situation" of August 1972. The documents, once seized, were properly retained thereafter since inmates had rea-

---

23. Appellants raise the issue, too, of the destruction of their legal materials. Yet if this court mandates the return of all legal material presently held by Marion officials, the issue of past destruction is one having relevance solely to a suit for damages. *See* Sigafus v. Brown, 416 F.2d 105 (7th Cir. 1969). The issue of future destruction would, of course, be moot, since action of this sort would constitute a direct violation of our return order and a contempt of court. We thus deal initially with the issue of return.

24. A second question presented in *Gilmore* and answered affirmatively, was whether or not a prison administration could enforce a regulation which required that "all briefs, petitions and other legal papers must be and remain in the possession of the inmate to whom they pertain." 319 F.Supp. at 112. Thus the district court did not reach the issue of whether inmates had a right to possess and retain their personal legal papers, or whether they had a right to possess legal materials like textbooks.

25. He did find that it was "uncertain whether legal materials relevant to any active or

pending litigation or appeals were in fact destroyed." 352 F.Supp. at 891. Had he made a similar finding with respect to papers which were held rather than destroyed, we would reject it as a basis for denying appellants their sought relief. *Sigafus*, it is true, involved on its facts legal papers which were allegedly essential to a pending suit. But the language of that case speaks in broad terms, and we decline to limit its holding. It cannot be gainsaid that legal materials are as essential to the preparation as to the prosecution of a legal action:

> [T]he free use of legal materials may lead some prisoners to the discovery that their substantive rights are being violated, and hence may be said to have a secondary substantive aspect itself, [yet] the right to prepare, like the right to communicate with the courts, is important primarily as an aid in remedying violation of other substantive rights. Note, Constitutional Rights of Prisoners: The Developing Law, 110 U.Pa.L.Rev. 985, 992 (1962).

And *see* Gilmore v. Lynch, 319 F.Supp. 105, 110 (N.D.Cal.1970).

sonable access to them under a newly adopted regulation.[26]

■■■ Reasonable access in this context is no better a standard than is "minimal access" in the setting of conferences between an inmate and his counsel. It is one thing to allow an inmate limited though reasonable access to the prison library or to a jailhouse lawyer. Neither can practicably be retained in an inmate's cell, and neither are possessed by him. It is quite another matter to deprive an inmate of an opportunity to pore over a personal and unobtrusive collection of legal books and papers within the confines of his cell. A fact of record abundantly clear is that no ongoing situation of riot and fire existed after August of 1972 or now exists to justify the continued retention of materials. Nor can the Government argue that an ever-present danger of riot justified the withholding of papers; only a few days after the August riot, inmates had clothes and mattresses returned to their possession, both apparently as flammable as the mattresses originally burned.[27] A situation of potential riot —assuming this to result from the presence of combustible objects in segregation cells—has thus existed for the past ten months. Legal materials should not be withheld on the dubious ground that they might serve as additional matter to burn during some future, though unanticipated, disturbance.

The district court shall order the immediate return to appellants of all legal materials previously confiscated and held by Marion authorities.

V

Lastly, appellants argue that their segregation constitutes cruel and unusual punishment. As we understand it, their attack is directed not so much to the conditions of their confinement as to the fact that their sentences to segregation by the Marion Adjustment Committee were indefinite.[28] Alternatively, they argue that the eleven months they have already served are more than sufficient to punish their alleged work stoppage.

From the premise that a term in segregation must be commensurate with the offense for which segregation is imposed, appellants would have us conclude that a prison adjudicative body concerned with discipline must as a constitutional matter impose a definite sentence whenever an inmate appears before it for punishment. The very notion of a "definite" sentence carries with it the implication that an inmate definitely sentenced would be automatically entitled to release after having completed his stay in segregation, his sentence having contemplated within its bounds the full punishment for his infraction of prison rules. To maintain his segregated status beyond his release date,

---

26. Marion Penitentiary, Policy Statement MI–7400.5C (July 17, 1972). The pertinent portion states:
 *An inmate in segregation has access to his personal legal material* and he may use institution owned legal references subjected to the procedures contained in Institutional Policy Statement MI–2001.1. In instances in which an inmate confined to segregation has legal proceedings that either must be accomplished or responded to within a set time limit, reasonable arrangements shall be made to assist him in meeting these deadlines by the availability of materials needed as established in Policy Statement MI–2001.1. (emphasis supplied).
 Curiously, the regulation seems on its face to allow in-cell retention of legal materials

by prisoners in segregation. It is evident, however, that Marion officials do not interpret the regulation as it reads.

27. A vital right of appellants is at stake. Without proof of its justifications by the Government, we must resolve doubts in favor of appellants. If, however, an inmate has displayed a marked propensity toward arson or suicide by fire—*see* Davis v. Schmidt, 57 F.R.D. 37, 42 (W.D.Wis.1972) —and if the prison warden has removed from his cell and replaced all flammable necessities of life, his access to, and not possession of, personal legal materials may be justifiable.

28. Counsel conceded this at oral argument.

prison officials would be required to resentence him at a hearing identical in its features of due process with the hearing at which he was originally sentenced. The only basis for an additional or extended sentence under these circumstances would be that the inmate had committed infractions while in segregation. Were this arrangement in effect at Marion, we would see no more reason than do appellants to question its constitutionality. But it does not follow that the indefinite sentencing scheme now employed at Marion is unconstitutional *per se,* for it may in fact provide an inmate with essentially all the protections which attend an arrangement of definite sentencing.

■ Segregation is imposed at Marion for an indefinite period, with periodic review fixed in frequency by regulation.[29] In addition to the question of whether infractions committed by an inmate while in segregation justify his continuation in that status, Marion officials must decide upon review whether the original infraction committed by the inmate is sufficiently serious to mandate a like result. As long, however, as the former question is asked and answered in an adversary setting identical to that which attended the initial placement of the inmate in segregation,[30] we see no constitutional infirmity in a scheme of indefinite placement. It is, indeed, essentially identical to an arrangement employing definite sentences, except that a segregated inmate's claim of disproportionate punishment becomes justiciable only after he has endured a period of segregation. We do not view this to be a distinction of constitutional importance.

In the second branch of their argument, appellants point to the more than eleven months they have spent in segregation, and assert that this punishment is more than adequate under the Eighth Amendment for a violation of prison work rules. As relief, they seek an order for their release to the general prison population. We reject their plea.

■ We recognize the general proposition that punishment which is disproportionate to the offense committed constitutes cruel and unusual punish-

---

29. *See* Marion Penitentiary, Policy Statement MI–7400.5C (July 17, 1972):

Adjustment Committees will meet no less than three times a week. All inmates in segregation status will be reviewed at least once a week on the record. At the time of this review, the Committee will determine if any program changes are needed, and will document the record accordingly.

Every inmate who spends over ten continuous days in segregation will have his case formally reviewed by the Committee a second time and this review will be repeated at least every 30 days thereafter that the inmate remains in segregation. This means that the Committee will have the inmate appear before them or if the circumstances so dictate, the Committee will visit the inmate where he is being confined. If commitment to segregation continues beyond 30 days there will be a psychiatric or psychological interview. This interview and report should address itself particularly to the threat the inmate poses to himself or to others. The Committee's overall evaluation should also comment on the inmate's effect on the security or orderly operation of the institu-

tion. A similar interview and report shall be made no later than each six months thereafter.

The 10 day and 30 day reviews will be documented along with the Committee findings or decisions and will be sent to the next highest authority for review. . . . A copy of the 30 day review will be sent to the Assistant Director of Institutional Services.

30. Marion Penitentiary, Policy Statement MI–7400.5C (July 17, 1972) (Def.Ex. 2), states:

If an inmate commits further offenses or violations while in segregation status, he shall appear before the Adjustment Board and/or Treatment Team, if the disposition is likely to result in extending his stay in segregation.

This appearance, of course, must conform to *Miller* if it results in an extension of an inmate's stay in segregation. Since the cited regulation is arguably interpretable to authorize this form of proceeding, the question of Marion procedure on review—being unripe—is an issue not justiciable at this time.

ment, whether imposed without or within prison walls. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L. Ed. 793 (1910); Wright v. McMann, 321 F.Supp. 127 (N.D.N.Y.1970); Fulwood v. Clemmer, 206 F.Supp. 370 (D. D.C.1962). Disproportionality, however, is partly a question of fact and wholly one of degree. An inmate who refuses to shave his beard does not ordinarily deserve solitary confinement; conversely, the mastermind of a large-scale escape attempt or a devastating riot may justly receive more than a few days in isolation from his fellow inmates. Contrary to what appellants would have us believe,[31] the instant case does not present us with this sort of concrete and single violation of prison rules. The appellants have taken part in more than a work stoppage; the record tells us, too, of other misconduct and of disturbances in the segregation units on at least three dates between August and October of 1972. The trial judge ruled:

> The hardships imposed upon plaintiffs [by segregation] were a direct result of their violations of prison rules, their attempts to create disturbances

amounting to near riots, and their threats to prison personnel and security, verbally, by actions, and by the concealment of contraband and weapons. 352 F.Supp. at 889.

Appellants do not attack the finding as clearly erroneous, and we must accept it. Without a more exact idea of the offenses committed by each inmate, or the classification of inmates by the type and extent of their misbehavior, we cannot properly decide the issue of disproportionate punishment, since we are unwilling to rule in the abstract that punishment by eleven months of segregation for the numerous infractions listed by the trial judge constitutes a violation of the Eighth Amendment. Should the appellants wish to press their contention of disproportionate punishment, the hearings we have ordered [32] and the written memoranda which will result [33] will provide a more satisfactory factual basis for their claim.

The case is remanded to the district court for an appropriate order and for further proceedings in conformity with this opinion. The mandate from this court shall issue forthwith.

---

31. They put the issue as follows:
[A]ssuming, arguendo, that the Plaintiffs were *all* guilty of participating and/or agitating a work stoppage, these acts . . . did not justify the trial judge's categorization as "outright mutiny" nor the severity of punishment to which Plaintiffs were subjected. App.Br. at 68.

32. These must, of course, encompass misfeasance other than the work stoppage if Marion officials intend to rely on it in support of segregating appellants.

33. Marion Penitentiary, Policy Statement MI–7400.5C (July 17, 1972), requires:
The disciplinary Committee reports will clearly state what happened (the of-

fense), where it occurred, time it occurred, and any witnesses (staff or inmates). A statement from the inmate about the offense will also be included. A clear statement of the conclusions of the Committee, as to involvement in prohibited acts, the information upon which the conclusion is based, and its disposition will be included in the report. If the conclusions of the Committee as to either the findings or the disposition are not unanimous, this will also be recorded. All Committee members will sign the report. The inmate will be advised in writing of the Committee's decision.