John W. KEKER et al.,
Plaintiffs,

v.

R. K. PROCUNIER et al.,
Defendants.

Civ. No. S–74–348.

United States District Court,
E. D. California.

Aug. 8, 1975.

John W. Keker, pro se, and Kipperman, Shawn & Keker, San Francisco, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen. of California by William G. Prahl, Sacramento, Cal., for defendants.

## OPINION

MacBRIDE, Chief Judge.

The primal issue presented by this case is whether attorneys at law may state a claim for violation of their rights to practice their chosen profession. This action was brought by two licensed California attorneys against officials of the California state correctional system pursuant to Title 42 U.S.C. § 1983.[1] Jurisdiction is afforded by Title 28 U.S.C. § 1343.[2]

Plaintiffs allege in their complaint that defendants interfered with their rights to lawfully practice their profession by the creation of conditions at Folsom prison. The complaint alleges that on May 7, 1974, plaintiffs visited their client, Earl Gibson, at the prison, and were met with the following conditions: an uncomfortably hot interview room, separation from their client by a glass partition, communication via telephone, and continual surveillance by a guard who observed them through a window. Additionally, plaintiffs claim that a woman, non-attorney investigator visited the same prisoner immediately before them and was not subjected to the same conditions. On these facts, plaintiffs allege that the following constitutional provisions were abridged: Fourteenth Amendment due process clause; Fourteenth Amendment equal protection clause; Eighth Amendment cruel and unusual punishment provision; and Sixth Amendment right to counsel provision. Plaintiffs seek injunctive relief, compensatory damages and punitive damages.

The case is currently before the court for resolution of defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b). The motion to dismiss challenges directly the legal sufficiency of the complaint and asserts that the complaint fails to state a claim against defendants upon which relief can be granted. Although defendants have attached numerous affidavits and exhibits to their memoranda, this court need not and does not consider them on a motion to dismiss, but rather, construes the allegations of the complaint in a light most favorable to the plaintiffs, and accepts the allegations of the complaint as true. *California Motor Transportation Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Dodd v. Spokane County*, 393 F.2d 330 (9th Cir. 1968); *Brown v. Brown*, 368 F.2d 992 (9th Cir. 1966).

1. § 1983: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. § 1343: The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: . . . (3) to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . .

## THE RIGHT TO PRACTICE LAW

■ The Fourteenth Amendment guarantees an individual the right to engage in any of the common occupations or professions of life. Such a right is both a "liberty" and "property" right protected from state deprivation or undue interference. *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Larkin v. Bruce,* 352 F.Supp. 1076 (Wis.1972).

By analogy, recent cases dealing with physicians are instructive in defining the boundaries and limits of the right to practice a profession or to engage in an occupation. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Nyberg v. City of Virginia,* 495 F.2d 1342 (8th Cir. 1974), appeal dismissed, *cert. denied,* 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974); *Larkin v. Bruce,* 352 F.Supp. 1076 (Wis.1973), appeal dismissed, 483 F.2d 1407 (7th Cir. 1973); *Young Women's Christian Association of Princeton v. Kugler,* 342 F.Supp. 1048 (N.J.1972), *affirmed,* 493 F.2d 1402 (3d Cir. 1974).

The United States Supreme Court in *Roe v. Wade, supra,* and *Doe v. Bolton, supra,* clarified the right of physicians to assert *their* constitutional rights to practice medicine, including the right to advise and perform abortions without undue state interference. See *Nyberg v. City of Virginia, supra.* As Mr. Justice Blackmun, writing for the court in *Roe v. Wade, supra,* at 163 and at 165, 93 S. Ct. at 732, 733, stated:

> "[F]or the period of pregnancy prior to this 'compelling' point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State."

> "[This] decision vindicates the right of the physician to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention."

As the Court of Appeals in *Nyberg v. City of Virginia, supra,* stated, citing the Supreme Court decisions in *Roe v. Wade, supra,* and *Doe v. Bolton, supra:*

> "We think that the Supreme Court . . . has clearly paved the way for physicians to assert their constitutional rights to practice medicine, which now includes the right to advise and perform abortions." 495 F.2d at 1344.

■ This court can discern no reason why attorneys should not be afforded the same scope of constitutional protection as is afforded to physicians. Legal issues and questions pervade virtually all aspects of our increasingly complex society. The modern attorney must at times be lawyer, counselor and advocate. Just as the physician is entrusted by society with the enhancement and preservation of life and health, the attorney is charged with advancement and protection of property, of liberty, and occasionally, of life.

Expanding upon its decision in *Nyberg v. Virginia, supra,* the Eighth Circuit Court of Appeals has recently held that "with even stronger force [than the right to practice medicine] it may be said that a lawyer has standing to challenge any act which interferes with his professional obligation to his client." See *Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investigation,* 507 F.2d 1281 (8th Cir. 1974).[3]

---

3. This court is fully mindful of the recent memorandum issued by a panel of the Ninth Circuit Court of Appeals in *Silver v. Queen's Hospital,* 518 F.2d 555 (1975). In

**■■** As an initial matter, it must be said that the acts of the defendant State officials as alleged in the complaint do constitute an interference with plaintiffs' right to practice their profession. The right to practice a profession necessarily includes the right to practice according to the highest standards of that profession. *Nyberg v. Virginia, supra; Young Women's Christian Association of Princeton v. Kugler, supra.* At the foundation of the legal practice is the right to maintain the privacy and freedom from intrusion essential to the attorney-client relationship.

**■** If plaintiffs and their clients are forced to meet in an uncomfortably hot room when other, more amenable facilities are reasonably available, if communication between attorney and client is circumscribed by partitions, limited by telephone restrictions, and subject to continual surveillance, then clearly the plaintiffs, as attorneys, have been subjected to interference in their right to practice their chosen profession. Additionally, the privacy implicit in the attorney-client relationship has been seriously infringed.[4]

It is, of course, apparent that a point will be reached on the continuum of the attorney's right to practice at which the interest of the State becomes so important that an interference is countenanced. Such interference by the State would no longer be an "undue" infringement on the right to practice, but would rather be a necessary vindication of a greater right or public interest. There arises, therefore, the question of what standard should be applied by this court in testing the administrative prison regulations and conduct of prison officials which are challenged by plaintiffs.

**■** Standards used for the purpose of evaluating statutory and regulatory classifications vary in accordance with the interests affected. *Marshall v. Parker,* 470 F.2d 34 (9th Cir. 1972), *affirmed* 414 U.S. 417, 94 S.Ct. 700, 38

that case the named plaintiff, a doctor, on behalf of a class of patients sued, *inter alia,* to secure staff privileges at hospitals in the State of Hawaii. In ruling on the several claims raised, the Ninth Circuit noted as follows:

> "Dr. Silver alleged that he had been deprived of the right to practice his profession, of the right professionally to have access to the defendant hospitals, and of the right to equal protection of the laws in that he had been denied staff privileges because of his religion. Plaintiff patients alleged that by virtue of the denial of staff privileges to Dr. Silver they had been denied the right to use of defendant hospitals and to the doctor of their choice. With the exception of Dr. Silver's claim founded on religion, these claims are not based on rights guaranteed by the Constitution or laws of the United States."

In view of the Ninth Circuit panel's disposition of this case on other grounds (i. e. *res judicata* ), these comments should be accepted as dictum only. No citations are made nor is authority cited. It is also possible that the panel viewed this case not as a suit to vindicate the right to practice a profession, but rather by analogy as a case similar to suits by untenured faculty members to secure tenure. In any case, the decision of the panel in *Silver* is in the form of an un-

published memorandum and as such, is not binding on this court.

4. The interference inherent in a system as is alleged to exist at Folsom is amply stated in the case of *Adams v. Carlson,* 488 F.2d 619 (7th Cir. 1973) where similar conditions were present. As noted by the *Adams* court: "Documents and written communications cannot be passed directly from lawyer to inmate; a guard, materials in hand, must circumvent the outer perimeter of the room, often taking as long as five minutes. If the attorney chooses not to take this option, but nevertheless desires to discuss with his client the contents of one or more documents not then in the possession of the inmate, he must hold the document to the glass partition and refer to it from memory or from an extra copy as he speaks to his client over the phone. Contemporaneous discussion of two or more documents, or of a ponderous transcript, thus becomes a formidable undertaking. Equally formidable, it is argued, is an attempt by two or more attorneys to speak to one or more inmates, a particular problem in class action litigation of the sort now on appeal. Lastly, attorneys for appellants note the difficulty of establishing from behind glass a satisfactory working relationship with inmates who survive daily in an atmosphere charged with distrust." 488 F.2d at 630.

L.Ed.2d 618 (1974). In the typical case, courts test challenged statutes and regulations by the *traditional standard* of determining whether there is a reasonable basis supporting the enactment or regulation, and whether the enactment or regulation is free from invidious discrimination. This traditional standard is most often applied in economic and social welfare regulations. *Hagler v. Finch,* 451 F.2d 45 (9th Cir. 1971), *cert. denied,* 405 U.S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 805 (1972); *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L. Ed.2d 231 (1971).

■ But where the statute or regulation threatens a "basic" civil right, it is considered suspect, and the courts, applying a *strict standard,* will only sustain the statute or regulation where it can be supported by a showing of a *compelling state interest. United States v. Karnes,* 437 F.2d 284 (9th Cir. 1971); *United States v. Thoresen,* 428 F.2d 654 (9th Cir. 1970).

■ Normally, the compelling state interest test is applied in cases of suspect classifications. *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). However, the courts have not hesitated to apply the compelling state interest standard to test statutory enactments and regulations which interfere with fundamental or basic rights, even though such rights are not expressly or specifically enumerated in the Constitution. Thus, *Roe v. Wade, supra,* applied the strict standard when testing an interference with the right of privacy; in *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 800 (1969), the right of travel; in *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the right of procreation; and in *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the right to marriage.

Not every important constitutional right rises to the level of a fundamental right, however. The right to a public education, for example, has been recognized as a right protected by the Four-

teenth Amendment, but has not been found to be so fundamental as to preclude state regulation or interference but for a compelling interest. *Alexander v. Thompson,* 313 F.Supp. 1389 (Cal.1970).

In *Meyer v. Nebraska, supra,* the Supreme Court noted that the right of the individual to engage in the common occupations of life, guaranteed by the Fourteenth Amendment, could not be interfered with by the state in an arbitrary manner or in a manner which has no reasonable relationship to some purpose within the competency of the state. 262 U.S. at 399–400, 43 S.Ct. 625. This language indicates strongly that the traditional standard of reasonable basis should be utilized in testing state interference with the right to practice a profession or engage in an occupation.

The case of *Adams v. Carlson,* 488 F. 2d 619 (7th Cir. 1973) is especially instructive. The Court of Appeals in *Adams* was confronted with a suit by inmates at a federal prison seeking injunctive relief to permit access to their attorneys. As an initial matter, the *Adams* court recognized the development of the inmate's right of access to his attorney:

"Citation of authority is hardly needed for the proposition that an inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold. All other rights of an inmate are illusory without it, being entirely dependent for their existence on the whim or caprice of the prison warden. The judiciary, moreover, has not been content merely to keep free the lines of communication between the inmate, the courts, and agencies of correction. Whether as a vital concomitant of the prisoner's right to petition the bench or as a distinct requirement of his right to effective counsel guaranteed by the Sixth Amendment, a right of access by an inmate to counsel has been perceived by a number of courts. [Numerous citations omitted]" 488 F.2d 630.

The *Adams* court was faced with a governmental assertion of need to continue the use of glass partitions and telephone systems to separate maximum-security prisoners from their attorneys. The court declined, however, to accept the plaintiff's invitation to find that a fundamental interest or right was threatened by these conditions. Instead, the *Adams* court determined that the conditions could be adequately tested by the traditional standard of reasonable basis. The court's rationale is as follows:

"What is involved, instead, is a restriction on the ease with which attorney-client meetings *could* be carried on, and a lessening of personal interplay between inmates and counsel. By so phrasing the issue, we do not intend to denigrate its importance; nevertheless, we do not view the partition to create an impediment to communication of the magnitude seen where direct censorship is undertaken by prison officials." 488 F.2d at 631.

Similarly, in the instant case, it would appear that the traditional standard of rational basis would be appropriate to test the constitutionality of the system of inmate-attorney access. The traditional constitutional standard is sufficient to preserve both the important rights raised by plaintiff as well as the significant interests of the state in maintaining secure penal institutions.[5]

In a memorandum of additional points and authorities filed with this court on March 13, 1975, defendants have cited the recent Supreme Court decision in *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) for the proposition that the *Adams v. Carlson, supra,* decision cannot be relied upon herein. *Pell v. Procunier, supra,* held that neither prisoners nor journalists had the "right" to face-to-face interviews. The *Pell* decision, however, is distinguishable from the situation presented by the instant case. The *Pell* decision was grounded on two bases: (1) in view of the prisoners' alternative channels of communication, e. g. mail privileges, the regulation prohibiting face-to-face meetings between inmates and reporters did not abridge the prisoners' freedom of speech; (2) nor did the regulation abridge the journalists' freedom of the press because the regulation did not deny the media access to sources of information available to the general public.

In the case at bar, however, it is clear that alternative channels of communication, such as mail, would be patently inadequate to preserve the rights and interests inherent in the attorney-client relationship. And while the Supreme Court has held that media representatives do not enjoy rights of access greater than the rights enjoyed by members of the public in general, such reasoning is not applicable to attorneys seeking access to their clients. In fact, the Supreme Court made clear that its decision in *Pell* dealt only with the right of access of media representatives, and in no wise addressed the question of access of members of prisoners' families, the clergy, attorneys, and friends of prior acquaintance.[6]

---

5. The defendants' burden in such cases was appropriately stated in *Adams v. Carlson, supra*. In the first place, the defendants would have to show the following:

"To justify his impairment of communication between attorneys and inmates in the name of security, a prison warden must come forward with facts which tend to support a reasonable suspicion not only that contraband is being smuggled to inmates in the face of established preventative measures, but that their attorneys are engaged in the smuggling." 488 F.2d at 631–632.

Additionally, even if the defendants could show justification for their actions, there may have been less restrictive means and methods available to achieve the legitimate ends sought. 488 F.2d at 632. In this regard, it is interesting to note that plaintiffs in the instant case, just like the attorneys in *Adams* had requested and had consented to searches of their person.

See also *Gilmore v. Lynch,* 319 F.Supp. 105 (Cal.1970), *affirmed,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971).

6. See 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495, 503 (1974).

## EQUAL PROTECTION

Plaintiffs' assertion that defendants denied them the equal protection of the laws is grounded in the allegation that a woman investigator, who was not an attorney, was permitted to meet with Earl Gibson on the same day in a much more suitable room.

■■■ It is, of course, proper for a person adversely affected by state action to bring a cause of action under Title 42 U.S.C. § 1983 on grounds of denial of equal protection of laws. *Shock v. Tester*, 405 F.2d 852 (8th Cir. 1969), *cert. denied* 394 U.S. 1020, 89 S.Ct. 1641, 23 L.Ed.2d 45 (1969). Allegations of classifications based upon sex are cognizable under § 1983. *Scott v. Opelika City Schools*, 63 F.R.D. 144 (Ala.1974).

■■■ A thorough reading of the complaint does not, however, clarify whether the allegations of denial of equal protection are based on classifications of sex (male-female), occupation (attorney-non-attorney), or simply unequal treatment of prison visitors. Nevertheless, this court need not reach the question whether plaintiffs have stated a claim of denial of equal protection since defendants have simply not challenged the equal protection allegations in their motion to dismiss.

## SIXTH AMENDMENT AND EIGHTH AMENDMENT CLAIMS

■■■ Defendants have argued in their motion to dismiss that plaintiffs have no standing to raise any Sixth Amendment or Eighth Amendment rights which might be asserted by Earl Gibson. This court is of the opinion that a plaintiff may indeed raise the constitutional right of another where the relationship between the plaintiff and that other party are inextricably entwined. In such situations, the infringement of the rights of one works a direct diminution of the rights and interests of the other. See particularly *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 225 (1974); *Adams v. Carlson*, 488 F.2d 619 (7th Cir. 1973); *Young Women's Christian Association of Princeton v. Kugler*, 342 F.Supp. 1048 (N.J.1972), *affirmed*, 493 F.2d 1402 (3d Cir. 1974).

In *Procunier v. Martinez, supra,* a unanimous Supreme Court reasoned that where prisons impose censorship of mail, not only are the rights of prisoners curtailed, but there is a direct impact on the rights of the other correspondent. As the court said at 94 S.Ct. 1809:

"[C]ensorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners."

Similarly, in the "physician-abortion" cases cited earlier in this opinion, the courts have recognized that the rights and interests of the physicians are so closely interwoven with the rights and interests of the patients that the physicians have the requisite standing to raise the infringement of affected rights of both parties.

As the Court of Appeals noted in *Nyberg v. City of Virginia, supra*:

"The impact of the [Supreme Court's decisions in *Roe* and *Doe*] cannot be fairly said to limit standing to sue in abortion cases to pregnant women. Neither can these opinions be read so narrowly as to accord standing only to a physician threatened with criminal prosecution. See *Doe v. Bolton, supra* at 188–189 of 410 U.S., 93 S.Ct. 739. Clearly the claims of medical doctors to 'freely practice medicine according to the highest medical standards without arbitrary outside restraints' are inextricably bound up with the privacy rights of women who seek abortions." 495 F.2d at 1344.

Similarly, the First Circuit Court of Appeals has held that *both* candidates

for public office and voters may challenge on its face a state candidacy restriction. *Mancuso v. Taft*, 476 F.2d 187 (1st Cir. 1971).

Standing, after all, is a requirement arising from Article III, sec. 2 of the Constitution which limits judicial cognizance only to issues where there exists an actual "case" or "controversy." The interest of physicians in vindicating their rights as well as the rights of their patients in the "abortion" cases has been held to be of sufficient immediacy and reality so as to afford them standing to present both their "case" as well as the patient's "case." *Nyberg v. City of Virginia, supra.* By the same token, in appropriate circumstances, an attorney's interest in vindicating his right to practice his chosen profession may be so closely linked with rights of a client that the attorney ought to be given the standing to present both his own as well as his client's "case." It remains, therefore, to be determined whether plaintiffs herein may raise allegations seeking to vindicate Sixth Amendment and Eighth Amendment rights of Earl Gibson.

Among the rights guaranteed by the Sixth Amendment is the right of an accused in criminal proceedings to the assistance of counsel for his defense. A necessary concomitant of that right, inherent in the Sixth Amendment, is the right to representation by *effective* counsel. *Poe v. United States*, 233 F. Supp. 173 (D.C.1964), *affirmed*, 352 F. 2d 639 (D.C.Cir.1965). Were Earl Gibson, the client, raising the contention contained in the complaint herein, it would be said that he had stated a cause of action for denial of Sixth Amendment rights. See *Adams v. Carlson, supra.*

This court can perceive no reason why plaintiffs, the attorneys for Earl Gibson, should not also be permitted to raise the question of violation of Sixth Amendment rights. The mirror-image of the client's Sixth Amendment right to effective counsel is the attorney's right to practice his profession without undue governmental interference. The vindication of one is consequently dependent upon the vindication of the other. The client's rights and the attorney's rights are as closely intertwined as the rights of physicians and clients in the "abortion" cases, or the rights and interests of the correspondents in *Procunier v. Martinez, supra.*

In *Wounded Knee v. F. B. I., supra,* the Eighth Circuit Court of Appeals recognized the interrelationship between the attorneys' right to practice law and the client's right to effective representation of counsel. In that case, the court stated as follows:

"At issue in the merits of the case (not yet determined) is the right of members of the Committee to provide effective assistance of counsel to their Indian clients who wish to avail themselves of their Sixth Amendment rights. . . . With even stronger force [than the situation present in *Nyberg*] it may be said that a lawyer has standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel. It requires no citation of authorities to reaffirm our historic commitment to effective assistance of counsel in criminal cases. That right may not be fettered by harassment of government officials, and any claim which factually asserts such harassment presents a federal question for our determination." 507 F.2d at 1284.

Accordingly, it is the opinion of this court that the plaintiffs herein have standing to assert the Sixth Amendment right of counsel possessed by their client. See also *Russo v. Byrne*, 409 U.S. 1219, 93 S.Ct. 21, 34 L.Ed.2d 30 (1972). Since the parties to this action have not addressed the question whether *both*

damages and injunctive relief might be available on the Sixth Amendment issue, this court takes no position on the question at this time.

The Eighth Amendment prohibits, *inter alia,* the imposition of "cruel and unusual" punishment. The phrase "cruel and unusual" punishment has never been precisely defined, and the courts generally view it as a flexible concept which tends to broaden as society matures in its regard for human decency and dignity. *Holt v. Sarver,* 309 F.Supp. 362 (Ark.1970), *affirmed,* 442 F.2d 304 (8th Cir. 1971); *Collins v. Hancock,* 354 F. Supp. 1253 (N.H.1973); *Rhem v. McGrath,* 326 F.Supp. 681 (N.Y.1971).

■■■ Generally, however, the Eighth Amendment prohibits only such punishment as is excessive and which is so barbarous or oppressive that it shocks the collective conscience of our society. *LaReau v. MacDougall,* 473 F.2d 974 (2d Cir. 1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

Even when the complaint in this case is read in a light most favorable to plaintiffs, this court cannot say, nor has it been cited to a case which would hold, that the alleged conduct of defendants rises to the level of "cruel and unusual" punishment. As noted, the allegations of the complaint adequately state a cause of action for violation of other constitutionally protected rights. The proving of those allegations would adequately permit redress of constitutional deprivations. However, the restrictions and conditions alleged to have been imposed by defendants, even if true, are not acts which are so barbarous or oppressive as to shock the conscience.

■■■ Accordingly, it is the conclusion of this court that no cause of action has been stated for redress of rights secured and protected by the Eighth Amendment.

## VAGUE, CONCLUSORY ALLEGATIONS

Defendants have also challenged the complaint on the ground that it contains vague and conclusory allegations. Federal Rules of Civil Procedure 8 requires only that the complaint should contain a short and plain statement of the claim showing that the pleader is entitled to relief. There is case law, however, that in actions for damages against public officials under the Civil Rights Act, the plaintiff must allege highly specific facts to defeat a motion to dismiss. *Friedman v. Younger,* 46 F.R.D. 444, (Cal.1969); *Agnew v. City of Compton,* 239 F.2d 226 (9th Cir. 1956), *cert. denied,* 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed. 2d 910 (1957).

■■■ However, even under the most stringent requirements of pleading, the allegations contained in the instant complaint are clearly sufficient to overcome a motion to dismiss. The complaint specifically enumerates the events, times and dates of the alleged interferences with rights, and particularly lists the rights alleged to have been infringed. In this regard, the complaint sufficiently gives notice to defendants as to what conduct is alleged to have been violative of plaintiffs' rights.

## LIABILITY OF PROCUNIER

Defendants cite the case of *Patrum v. Martin,* 292 F.Supp. 370 (Ky.1968), for the proposition that an official who has general supervision over police officers who committed allegedly wrongful acts is not responsible under the Civil Rights Act unless he himself was present or personally directed such acts or cooperated in them. Defendants claim, therefore, that Procunier, a named defendant and former head of the California Department of Corrections, cannot be held vicariously liable under the doctrine of *respondeat superior* under the Civil Rights Act.

■■■ It is, indeed, the rule in this Circuit that a defendant can only be liable under the Civil Rights Act by way of the doctrine of *respondeat superior* where a state statute specifically makes that defendant responsible for the acts of subordinates. *Hesselgesser v. Reilly,*

440 F.2d 901 (9th Cir. 1971). However, this doctrine is of no aid to defendants in their motion to dismiss. Plaintiffs have consistently contended in their memoranda and in oral argument that they seek to establish the liability of Procunier not on the basis of *respondeat superior,* but on the basis of the *personal* participation and direction of Procunier. In paragraph 16 of their complaint, for example, plaintiffs allege that the conditions and restrictions imposed on them were acts done with the knowledge, permission, consent and participation of Procunier in that he promulgated the regulations and rules and directives governing the conditions under which attorneys and inmates were permitted to meet and confer.

The truth of such an allegation must, of course, await the determination of trial on the merits, but it is a sufficient allegation of personal participation to overcome a motion to dismiss.

## SOVEREIGN IMMUNITY OF PROCUNIER

Another contention is raised by defendants' motion to dismiss—that of the "sovereign immunity" of Procunier. Defendants have argued that Procunier, in promulgating the regulations governing the conditions under which attorneys and inmates can meet and confer, should be afforded the mantle of legislative immunity. See Defendants' Further Memorandum, page 6 (December 16, 1974).

As an initial matter, this court cannot accept the proposition that *legislative* immunity should be applicable to the acts of an executive officer in a generally executive function. Nevertheless, Procunier certainly would be afforded whatever protection is provided by *executive* "immunity", and accordingly, this court will view the matter from that perspective.

There are only, two "types" of immunities which might shield Procunier as an executive officer: state-created immunities and federally-created immunities. In a civil rights action, however, state-created immunities will not protect Procunier because federally grounded civil rights cannot be impaired by state laws governing sovereign immunity or official privilege. *Willis v. Reddin,* 418 F.2d 702 (9th Cir. 1969).

Immunity governed by federal law, at least as applied to executive officers, received its most recent exposition by the Supreme Court in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *Scheuer v. Rhodes, supra,* clarified the rule that public officials of the executive branch have a "qualified immunity" from suit under § 1983. Police officers, for example, may be sued under § 1983 but the defense of "good faith and probable cause" is available to them. As to higher officers in the executive branch, such as Procunier, the inquiry becomes more complex and the court stated at 94 S.Ct. 1692:

"[A] qualified immunity is available to officers of the executive branch of Government, the variation dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of a reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with a good faith belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct."

Clearly, the "qualified immunity" of executive officers may be an extremely broad one. Nevertheless, *Scheuer v. Rhodes, supra,* held that since the question of immunity is a factual inquiry, it is not properly tested on a motion to dismiss. Accordingly, the qualified immunity envisioned by *Scheuer v. Rhodes, supra,* is appropriately raised as a defense, and is not a bar to suit.

## PUNITIVE DAMAGES

One final contention is raised by defendants for the first time in their memoranda of points and authorities, although not specifically in their motion to dismiss. Nevertheless, the court will deal with it herein.

Defendants have asserted that the claim for punitive damages in the complaint should be "dismissed" because the plaintiffs have failed to allege facts from which it may be inferred that the defendants acted wilfully or in gross disregard of the complaining parties.

As in initial matter, it is established law that punitive or exemplary damages are recoverable in § 1983 actions. *Fisher v. Volz*, 496 F.2d 333 (2d Cir.1974); *Gill v. Manuel*, 488 F.2d 799 (9th Cir. 1973). As noted in the case of *Fisher v. Volz, supra,* punitive damages are not a favorite in the law and are to be allowed only within narrow limits. The assessment of such damages necessarily and inherently involves the evaluation of the following factors: (1) the nature of the conduct; (2) the wisdom of some form of pecuniary punishment; and (3) the advisability of a deterrent.

Punitive damages have been held permissible where defendants have acted wilfully or in gross disregard for the rights of the parties; where the defendants acted maliciously or in bad faith or for an improper motive; or where an award is necessary to prevent future occurrences. *Lykken v. Vavreck*, 366 F.Supp. 585 (Minn.1973); *United States ex rel Motley v. Rundle*, 340 F. Supp. 807 (Pa.1972); *Urbano v. McCorkle*, 334 F.Supp. 161 (N.J.1971), supplemented, 346 F.Supp. 51.

The complaint herein in paragraph 13 alleges that the acts of defendants were malicious, intentional, and deliberate. Again, the proof of such allegations must await trial on the merits. As far as a motion to dismiss is concerned, however, the complaint sufficiently states a claim as to punitive damages.

It is therefore the conclusion and order of this Court that defendants' motion to dismiss the action for failure to state a claim under the Eighth Amendment is granted, but in all other respects, the motion to dismiss is denied.

It is so ordered.