Laura Denvir Stith, Judge,
dissenting
I respectfully dissent. The majority affirms the trial court’s judgment terminating Father’s parental lights on the basis that the record shows that Father (1) failed to rectify the conditions that led to the court’s taking jurisdiction, and (2) is unfit to be a party to the parent-child relationship because he has been incarcerated since J.P.B.’s birth. The majority says that, while incarceration in itself does not make a parent unfit or constitute a failure to rectify, incarceration for more than a brief period does itself make a parent “unable to care appropriately for Child or provide Child with a safe, stable, and healthy home environment.” Op. at 92. In other words, it holds that the separation of parent and child caused by the incarceration makes the parent unsuitable and unable to rectify conditions leading to jurisdiction over an infant child, even where, as here, relatives of the parent were available to provide appropriate care pending the parent’s release from incarceration. For the reasons discussed below, this is palpably wrong. The court erred in terminating Father’s parental rights for failure to rectify and erred in finding him unfit.

*101
A. Failure to Rectify Conditions that Led to Jurisdiction of the Court

The majority says that Father’s rights can be terminated for failure to rectify pursuant to section 211.447.5(B), RSMo Supp. 2014, which states that termination is permitted when:
The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child’s prospects for early integration into a stable and permanent home.
While all agree that J.P.B. has been under the court’s jurisdiction for more than one year, the other elements simply are not met.
Regarding the second element, the majority says that “conditions of a potentially harmful nature continue to exist” because Father, due to his incarceration, is “unable to care appropriately for Child or provide Child with a safe, stable, and healthy home environment.”[1] Op. at 92. But, of course, there are many scenarios in which parents are unable to personally care for a child for a period of time, even for a period of years, without this making the parent unfit or without the parent being found to have failed to care for the child appropriately. Indeed, parents are often separated from children due to illness, military service, work requirements, or for other reasons, including incarceration. These parents’ rights are not terminated as a result of that separation, even though the child in each case is separated from the absent parent for a lengthy period, because the parent can arrange for another person, such as a relative, to “provide Child with a safe, stable, and healthy home environment.” See Op. at 92.
The majority might respond that this situation is different from others, for here there is no fit spouse to care for Child while Father is incarcerated. This scenario is, in fact, all too common. Even more importantly, it misses the point. The statute does not set a different standard for termination depending on whether a spouse is available as an alternative provider-of-care. Just as care appropriately can be given by one parent in the other’s absence, it also can be given by other relatives. Here, Father attempted to arrange for such alternate care when he sought placement of J.P.B. with Child’s paternal grandmother.
Section 210.565.1, RSMo Supp. 2013, provides that “[wjhenever a child is placed in a foster home and the court has determined pursuant to subsection 4 of this section that foster home placement with relatives is not contrary to the best interest of the child, the children’s division shall give foster home placement to relatives of the child.” As the majority notes, the trial court found placement with Grandmother was not in J.P.B.’s best interests, and section 210.565.4, RSMo Supp. 2013, provides, “The preference for placement and first consideration for grandparents or preference for placement with other relatives created by this section shall only apply *102 where the court finds that placement with such grandparents or other relatives is not contrary to the best interest of the child considering all circumstances.” But the majority fails to explain why the trial court so held.[2] It was not because the trial court found placement with Grandmother was inappropriate. To the contrary, the home study completed in August 2015, before Father’s rights were terminated, found Grandmother was an appropriate placement for J.P.B., and the Children’s Division recommended placing J.P.B. with Grandmother, Further, the court’s order denying placement with Grandmother found that, after learning of J.P.B’s birth in September 2014, Grandmother requested visitation in October 2014 and had been granted visitation beginning in November 2014. She requested placement of J.P.B. with her at that time and a home study was begun. The home study was suspended because it was thought that a cousin would be able to provide care for J.P.B., but when the cousin had to move out of state, Grandmother again requested a home study. During this period, Grandmother had many visits with J.P.B. and developed a loving and bonded relationship with him, as the trial court specifically found:
Visits between [Grandmother] and the minor child increased over time with [Grandmother], at the time of the hearing of the motion, receiving overnight and weekend visits with the minor child. [Grandmother] has been consistent with visiting the child and there was no evidence presented to suggest that the visits between her and her grandson were inappropriate. By all accounts, the minor child enjoys his visits with [Grandmother] and refers to her as his grandma. The [foster] family and [Grandmother] get along well together and have coordinated [Grandmother’s] visits with the minor child for a significant period of time.
Why, then, did the trial court find that it was not in the best interests of J.P.B. to be placed with Grandmother? Not because placement with Grandmother was inappropriate, but because J.P.B. had bonded with his foster family since being placed with them the prior year. And, no doubt, the record shows that the foster parents are fíne parents and would provide a good home for J.P.B. But it is circular to deny *103 visitation to Father and then justify a finding of lack of best interests in placing J.P.B. with Grandmother with the fact that the preference for placement with relatives was ignored for a sufficient length of time that J.P.B. has, in the interim, bonded with the foster parents.
In any event, even were placement with the foster parents in the best interests of J.P.B.—a questionable finding considering Grandmother’s bonding with J.P.B. and the statutory preference for placement with a relative under section 210.565.1— this cannot provide a basis for finding a failure to rectify. To do that, the court first must have found that Father failed to provide appropriate care for J.P.B., and because Grandmother was found to be an appropriate placement, that finding is not supported and the best interests analysis should never have been reached.
By finding a failure to rectify despite Grandmother’s appropriateness, the court is effectively finding that placing a child in the care of a loving relative is not sufficient to constitute appropriate care. This makes a huge percentage of children in this state subject to being removed from their grandparents, who are now earing for them, and placed in foster care pending termination of their parents’ rights for failure to rectify. Of course, the majority would not condone any such actions, for grandparents and other relatives are well able to care appropriately for their grandchildren during a parent’s temporary absence. It is Father’s incarceration that the majority really is saying makes Father unfit. Yet section 211.447.7, RSMo Supp. 2014, makes it clear that incarceration itself cannot provide a basis for finding a failure to rectify. It provides:
When considering whether to terminate the parent-child relationship pursuant to subsection 2 or 4 of this section or subdivision (1), (2), (3) or (4) of subsection 5 of this section [a court may consider]
[[Image here]]
(6) The conviction of the ‘parent of a felony ojfense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights
(emphasis added).
The majority tries to use the four-year length of Father’s incarceration to say that J.P.B. will be deprived of a stable home for a period of years, so that the third element of failure to rectify is present both because “there is little likelihood that [the harmful] conditions will be remedied at an early date so that the child can be returned to the parent in the near future” and because “the continuation of the parent-child relationship greatly diminishes the child’s prospects for early integration into a stable and permanent home.” Again, this finding ignores that Grandmother is bonded with J.P.B. and can provide a stable home for him until Father is released, and that Father is eligible for release in just two years.
In effect, the majority is adding an unstated additional phrase to section 211.447.7(6): that incarceration for more than a short period is a basis for termination if the child is an infant at the time of incarceration. This is not what the statute says, however, and the majority’s holding simply pays lip service to the provision that incarceration cannot provide a basis for termination. It means in reality that a large percentage of those incarcerated will be subject to having their parental rights terminated even though they had appropriately cared for their child and would be released from prison while their child was still at a young age.
*104 Moreover, the majority is wrong in saying that J.P.B. cannot start to develop a relationship with his Father until Father’s release. Were J.P.B. placed with Grandmother instead of with a non-relative foster family, then Father could begin to develop the family bonding and relationship that he has been denied the opportunity to develop because of the trial court’s denial of visitation with him by J.P.B., despite Father’s repeated requests for visitation. This is particularly appropriate here, as the record shows that Grandmother and J.P.B. are bonded, that Father will be eligible for parole in November 2018, that he already was incarcerated when J.P.B. was born, that ever since learning of J.P.B.’s birth Father has attempted to obtain visitation, that he writes two or three letters to J.P.B. each month, and that he has provided J.P.B. with every ordered child-support payment.
The trial court’s refusal to allow such visitation creates a self-fulfilling disqualification; it denies visitation because Father is incarcerated and then directs termination of parental rights because Father and J.P.B. are not visiting. Denial of visitation is not intended to be used as a wedge to keep parents and children apart and should not be used as a justification for termination of parental rights based on the lack of bonding caused by this artificial and subjective decision to separate the family.[3]
The majority states that Father’s efforts are not enough, noting that section 211.447.8, RSMo Supp. 2014, provides, “The court may attach little or no weight to infrequent visitations, communications, or contributions.” The context in which the visitations, communications, and contributions necessarily must be considered here, however, cannot be counted against Father. Father presented evidence that because he earns only $8 per month in prison, Child Support Enforcement permitted him to pay only $2 per month and would not allow him to pay any additional support. Father has communicated in the only way he has available, by letter, and has continued to attempt to obtain the right to in-person visits and bonding.
The majority is wrong in suggesting that Father somehow has forfeited his parental rights and has justified ignoring his substantial efforts to obtain visitation with J.P.B. because he did not appeal denial of visitation here directly. This is the termination of parental rights case. The denial of visitation was ordered in the custody case. I strongly doubt the majority is really intending to adopt a rule that requires parties to raise on appeal of a termination case errors made by a trial court in ruling on visitation and placement issues in a separate custody action. That certainly would be a first. Neither the visitation nor the placement orders were entered in this case, and neither could be appealed here.
Further, even were the custody case relevant here, the majority ignores Father’s substantial other efforts to ensure physical visitation with Child after the trial court denied Father’s first motion for physical visitation. He first tried to arrange for an alternative to physical visitation, such as through Skype, which the trial court indicated it would approve, but the Department of Corrections said it was unable to provide Father with the tools to videoconference with the one-year-old. Father then filed a second motion for physical visitation due to the failure of this *105 alternative but again was denied in-person visitation.
Like the court’s first ruling denying physical visitation, even were an interlocutory appeal of the second ruling allowed, it would have been unlikely to have brought Father relief because it was inherently interlocutory and could be revisited where, as here, the only reason the trial court denied visitation was because of the distance between Father and J.P.B., rather than any finding of inappropriateness of contact between them. That no doubt is why section 211.261.1, RSMo 2000, allows appeals only of “final judgments, orders and decrees.” See also In re A.N.L., 484 S.W.3d at 333-34; In re T.G.O., 360 S.W.3d at 356 (no right to appeal non-final order denying foster placement with relative). The majority suggests that he could have “appealed” by seeking a writ as to this order or as to the order on placement (despite being entered in a different lawsuit), and was unreasonable in failing to do so; no authority is cited because, of course, one is never required to seek a writ, that is why a writ is described as “extraordinary” relief.
In sum, Father cannot seek visitation in a termination case and so could not appeal a denial of that visitation here, but even so the record shows he made all reasonable attempts to obtain visitation, and the record does not show that Father is unable to appropriately care for J.P.B. or that the continuation of the parent-child relationship diminishes the likelihood of early integration of J.P.B. into a stable home. The record, therefore, does not support the trial court’s finding of a failure to rectify.

B. Finding of Unfitness under Section 211.447.5(6) (a)

The majority notes that the bar on consideration of the fact that the parent is incarcerated does not expressly apply to termination under section 211.447.5(6)(a), which governs termination when the parent is unfit to be a parent. Contrary to the majority’s truly startling reading of, the word “abuse” as used in that provision, however, this section does not provide a ground for termination. Section 211.447.5(6)(a) states in relevant part that parental rights may be terminated when:
The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse including, but not limited to, specific conditions directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child.
Id. (emphasis added).
The majority admits that Father has not abused J.P.B.—indeed, he has never been permitted contact with J.P.B. and is not accused of ever having abused any child or person. The majority says that this subsection nonetheless justifies termination of Father’s parental rights because by stating that a “specific abuse” can include “specific conditions” that are “of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental or emotional needs of the child,” the legislature has defined being unable to care “appropriately” for one’s child for the foreseeable future as a kind of “specific abuse.” Op. at 94-95.
First, even under the majority’s reading of the statute, termination is unjustified. As already noted, it is quite foreseeable that Father will be eligible for parole in two years. Further, the evidence shows that Grandmother is ready, willing, and able to care for J.P.B. in the interim, and *106 nothing about that care is shown to be inappropriate. Indeed, Father has never been found to be unfit to visit with his son, and if Grandmother were to receive custody, he could begin to form the bond that he has so anxiously and continuously fought to forge over the last two years to no avail.
Second, the majority’s reading of the statute simply is wrong. It tries to make sense out of including incarceration within the definition of the statute’s requirement that the state show “a consistent pattern of abuse” by parsing through the language of the statute prior to the 2014 amendment and comparing it to the statute as it stands today. But whatever reason the legislature may have had for leaving in the words “including, but not limited to” when it revised the statute, nothing suggests it made the change to include cases, such as this, when there is no “consistent pattern of committing a specific abuse,” a phrase the legislature also kept. It is far more logical to interpret the language to mean what it says—that if there are specific conditions of a relationship of parent and child that are abusive, and if they occur sufficiently repeatedly to constitute a pattern, and there is reason to believe that pattern will continue, then the statute applies. It is illogical to read it to convert a continuing non-abusive aspect of a parent-child relationship into a form of abuse, whether as one instance of abuse or as a pattern. There must be a specific abuse, and a consistent pattern of such abuse.
Here, Father is not accused of committing any abuse at all, much less a pattern of abuse. Being in prison when your child is born is neither abuse nor a pattern of abuse. Further, being in prison does not preclude a parent from caring for a child appropriately. If Father is unfit despite taking all possible measures to be with his child—and no one has identified other reasonable measures he could have undertaken—then so would be most fathers and mothers sent to a prison not located conveniently to their infant children’s location. Our juvenile divisions would be remiss in not moving for such termination as to all parents, for according to the majority, incarceration constitutes a consistent pattern of specific abuse. Of course, this is not the case.
Equally importantly, to read the statute in that manner puts it in conflict with section 211.447.7(6), which the majority acknowledges does not permit incarceration to form the basis for termination so long as it does not preclude a stable home for a period of years. While the majority says that this subsection does not apply to termination for specific abuse under section 211.447.5(6)(a), in this context the abuse is the incarceration, and so in any case of incarceration for more than a couple of years, the incarceration itself would provide the basis for termination. The protection provided by section 211.447.7(6) would be worthless if incarceration itself provides a separate basis for termination under a different subsection. This Court should not interpret a statutory provision such that it would render other provisions meaningless. See Wollard v. City of Kansas City, 831 S.W.2d 200, 203 (Mo. banc 1992) (“The legislature is presumed not to enact meaningless provisions.”); Denbow v. State, 309 S.W.3d 831, 835 (Mo. App. 2010) (refusing to interpret a statutory provision in a way that would render another provision of the same section meaningless).
To suggest that incarceration is not the reason for termination of Father’s parental rights is doublespeak. Of course it is the reason. For all of these reasons, I would hold that neither section 211.447.5(3) nor section 211.447.5(6)(a) provides a basis to terminate Father’s parental rights.

*107
C. Inability to Communicate with Counsel During Hearing

I agree with the majority that there is no constitutional right to appear in person at a civil trial. Call v. Heard, 925 S.W.2d 840, 846 (Mo. banc 1996). It was within the trial court’s discretion to deny Father’s request under § 491.230.2(1) to attend the trial in person. Beckwith v. Giles, 32 S.W.3d 659, 663 (Mo. App. 2000). But there is no question that a prison must not unduly interfere with a prisoner’s constitutional right to access the courts. Call, 925 S.W.2d at 846. As this Court noted in Call, the right to access courts does not mean the prisoner is entitled to “perfect access,” but it does entitle the prisoner to “meaningful access.” Id. This includes access to counsel, the majority acknowledges, for “pursuant to § 211.462.2, a natural parent has a statutory right to counsel in a termination of parental rights proceeding and, therefore, an implied right to effective assistance of counsel.” Op. at 96-97, citing C.V.E. v. Greene Cnty. Juvenile Office, 330 S.W.3d 560, 574 (Mo. App. 2010).
“Meaningful access” can be through “significant alternatives,” including video conferencing, which can provide “constitutionally sufficient access.. .by means other than the live presence at trial of the person in question.” Call, 925 S.W.2d at 846; see also McNeal v. McNeal-Sydnor, 472 S.W.3d 194, 197 (Mo. banc 2015). But it must still remain “constitutionally sufficient.” Videoconferencing that does not allow the prisoner to communicate with counsel privately during trial is not an adequate alternative to the prisoner’s presence at trial. There is no reason that Father should be denied a right that all others have at trial—meaningful confidential access to counsel.
“[C]onfidentiality of the communications between client and attorney is essential for such relationships to be fostered and effective.” State ex rel. Great Am. Ins. Co. v. Smith, 574 S.W.2d 379, 383 (Mo. banc 1978). As the Ninth Circuit found:
[I]t is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him. It takes no stretch of imagination to see how an inmate would be reluctant to confide in his lawyer about the facts of the crime, perhaps other crimes, possible plea bargains, and the intimate details of his own life and his family members’ lives, if he knows that a guard is going to be privy to them, too.
Nordstrom v. Ryan, 762 F.3d 903, 910 (9th Cir. 2014) (internal quotation and citations omitted).[4]
While Father was permitted (o attend the trial by video conference, his counsel was in the courtroom. They did not have a hookup that allowed them so speak privately; even when the courtroom was cleared on occasion to allow communication, that communication was not private because a guard and another person were present in the video-conferencing room with Father at all times. This is not what Call meant by “constitutionally sufficient access.” If this matter were remanded for *108 further proceedings, and in any similar hearings for Father or other parents, the trial court should ensure that the person participating by video conference is provided the necessary means for private, confidential communications with counsel during the hearing.
For the reasons set out above, I would reverse the termination of Father’s parental rights.

. The trial court also found neglect by Father, substance abuse, and a failure to engage in services. The majority does not rely on these findings because Father never had custody of the child born after his incarceration, Father has complied with social service requirements, and the evidence does not show substance abuse since his incarceration or that such abuse cannot be treated.

. The majority suggests that the Court is not to consider placement with Grandmother because Father did not “directly challenge” the trial court's order denying placement with Grandmother as part of this appeal. But the trial court’s order denying Father’s motion for placement is not a part of the case at hand, which deals solely with whether to terminate Father's parental rights. Instead, it is part of J.P.B.'s underlying custody case, which is still ongoing and lacks a final appealable judgment. Of course, this appeal is of the ruling in the termination of parental rights case, not the ongoing custody case. The confusion of the majority may be caused by the fact that the trial court informed Father before the beginning of the hearing of evidence in this termination of parental rights case that the court was going to enter an order denying his motion for placement with Grandmother later that same day, but it was so doing in the custody case. Father's attorney did all he could by requesting a continuance of the termination action so that he could attempt to seek review of the trial court’s order denying placement in the custody case. The motion for continuance was denied, and the trial resumed. Father could not appeal that custody case ruling in the instant termination action. Nor, it appears, could he have sought interlocutory review of the ruling in the custody case either, as appeals are allowed only of a final judgment, order, or decree. §§ 211.261.1; 210.720.1. See In re A.N.L. v. Maries Cnty. Juvenile Office, 484 S.W.3d 328, 333-34 (Mo. App. 2016); In re T.G.O., 360 S.W.3d 3SS, 356 (Mo. App. 2012) (no right to appeal non-final order denying foster placement with relative). Father has done what he reasonably could by indirectly challenging the trial court’s denial of placement with Grandmother in his petition in this Court.

. That is particularly true where, as here, the misconduct that led to Father's incarceration occurred before he knew of his son's existence; he cannot, therefore, be accused of choosing a criminal way of life with the knowledge that it would lead to separation from his son.

. See Coplon v. United States, 191 F.2d 749, 757 (D.C. Cir. 1951); see also Johnson-El v. Schoemehl, 878 F.2d 1043, 1052-53 (8th Cir. 1989) ("[P]laintiffs allege that they were only allowed to meet with their attorneys in public areas of the Jail where their conversations could be overheard by guards and other prisoners. ... Such conditions impeded the detainees' ability to prepare for trial, jeopardize confidentiality of their attorney-client communications and invade their right to privacy.”) (internal quotation and citations omitted); Adams v. Carlson, 488 F.2d 619, 631 (7th Cir. 1973) (''[Protection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context.”).